**Wasilie P. BOBBY, Sr., Individually and on Behalf of the People of Lime Village, Plaintiffs,**

v.

**STATE OF ALASKA, Defendants.**

**No. A84–544 Civil.**

United States District Court,
D. Alaska.

Feb. 14, 1989.

William E. Caldwell, Judith K. Bush, Alaska Legal Services Corp., Fairbanks, Alaska, for plaintiffs.

Larri Irene Spengler, Asst. Atty. Gen., State of Alaska, Juneau, Alaska, for defendants.

## MEMORANDUM OF DECISION

HOLLAND, Chief Judge.

This case raises important questions of first impression for the court with respect to the validity of regulations promulgated by the Alaska Board of Game for the implementation of subsistence hunting rights which are protected by federal law.

### BACKGROUND

In 1973, Congress began considering what ultimately became the Alaska National Interest Lands Conservation Act (ANILCA). ANILCA became law on December 2, 1980, as Pub.L. No. 96–487, 94 Stat. 2371, 16 U.S.C. §§ 3101–3233.[1] Title VIII of ANILCA pertains to the "subsistence way of life", making provision for subsistence management and use of "public lands" in Alaska. ANILCA §§ 801–816, 16 U.S.C. §§ 3111–3126, Title VIII. The term "public lands" is defined by ANILCA § 102(3). 16 U.S.C. § 3102(3). With certain exceptions "public lands" are lands situated in Alaska, the title to which is in the United States after December 2, 1980.

Lands owned by the State of Alaska and privately owned lands were thus not directly affected by ANILCA. However, ANILCA § 805(d), 16 U.S.C. § 3115(d), provided that the State of Alaska might opt to enact laws of general applicability consistent with ANILCA and thereby become entitled to manage fish and game on public lands as well as state-owned lands in Alaska. ANILCA § 805(d) provides:

(d) The Secretary shall not implement [the federal subsistence management program] if within one year from December 2, 1980, the State enacts and implements laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in, sections 3113, 3114 and 3115 of this title, such laws, unless and until repealed, shall supersede such

---

1. Pub.L. No. 96–487 is hereafter referred to as "ANILCA § ___".

sections insofar as such sections govern State responsibility pursuant to this subchapter for the taking of fish and wildlife on the public lands for subsistence uses. Laws establishing a system of local advisory committees and regional advisory councils consistent with this section shall provide that the State rulemaking authority shall consider the advice and recommendations of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses. The regional councils may present recommendations, and the evidence upon which such recommendations are based, to the State rulemaking authority during the course of the administrative proceedings of such authority. The State rulemaking authority may choose not to follow any recommendation which it determines is not supported by substantial evidence presented during the course of its administrative proceedings, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs. If a recommendation is not adopted by the State rulemaking authority, such authority shall set forth the factual basis and the reasons for its decision.

Anticipating the enactment of ANILCA by over two years, the Legislature of the State of Alaska adopted a subsistence priority statute in 1978. Ch. 151, SLA 1978.[2] Significantly, the Alaska priority for subsistence fishing and hunting thusly created was not restricted to Alaskans residing in rural areas. However, the Alaska Board of Fisheries adopted first a policy and later a regulation[3] which in effect linked subsistence fishing to particular geographic communities. Effective May 30, 1982, the Board of Fisheries and the Board of Game

jointly adopted a regulation which for the first time expressly associated subsistence fishing and hunting rights with rural residents through regulations adopted in 1982. 5 AAC § 99.010 (1982).[4]

By various submissions made by the State of Alaska between December 2, 1981, and April 29, 1982, the State of Alaska obtained, on May 14, 1982, a determination by the Secretary that the State's:

> [Subsistence P]rogram will be in compliance with Sections 803, 804, and 805 of ANILCA as of June 2, 1982. As a result of this certification of compliance, the State retains its traditional role in the regulation of fish and wildlife resources on public lands in Alaska.

Letter, James Watt (Secretary) to Jay Hammond (Governor of Alaska), dated May 14, 1982; Appendix II at 1. By reason of the foregoing determination, Alaska's 1978 subsistence priority statute became operative as to all state lands and to virtually all federally owned lands in Alaska.

Alaska's first subsistence fishing policies were successfully challenged in *Madison v. Alaska Department of Fish & Game*, 696 P.2d 168 (Alaska 1985). The Alaska Supreme Court held that Alaska's priority for subsistence fishing (and therefore presumably hunting also) would not permit the implementation of the subsistence community concept. After a detailed review of the legislative history of ch. 151, SLA 1978, the Alaska Supreme Court observed:

> The legislative history indicates that the legislature intended to protect subsistence use, not limit it. The words "customary and traditional" serve as a guideline to recognize historical subsistence use by individuals, both native and non-native Alaskans. In addition, *subsistence use is not strictly limited to rural*

---

**2.** The full text of ch. 151, SLA 1978, is reproduced in Appendix I at 1–5, inasmuch as relevant provisions are no longer published in Alaska's fish and game code (Alaska Statute 16), nor is it readily available in print elsewhere.

**3.** 5 AAC § 01.597, *reprinted in Madison v. Alaska Department of Fish & Game*, 696 P.2d 168, 172 (Alaska 1985).

**4.** Appendix I at 12–13. The Alaska Board of Fisheries understood ch. 151, SLA 1978, (in particular subd. 17, AS 16.05.940(23) (1978)) to permit the restricting of fishing by area of residence as a part of "first tier" subsistence use management, that is, area restrictions on use not preceded by elimination of other consumptive uses such as sport and commercial fishing. *See Madison v. Alaska Department of Fish & Game*, 696 P.2d 168, 174 (Alaska 1985).

*communities.* For these reasons, the board's interpretation of "customary and traditional" as a restrictive term conflicts squarely with the legislative intent.

*Madison,* 696 P.2d at 176 (emphasis supplied, footnote omitted).

At this juncture, the Alaska Supreme Court makes reference to ANILCA in a footnote. In addressing an argument made by the Board of Fisheries, the Alaska Supreme Court observes that legislation pending before Congress with regard to subsistence hunting and fishing when the Alaska Legislature adopted ch. 151, SLA 1978, did not then contain the "rural Alaska resident" limitation which ultimately became a part of ANILCA as now expressed in ANILCA § 803, 16 U.S.C. § 3113. In retrospect, it is clear that Alaska's first subsistence law failed in one material respect to anticipate what Congress would require in ANILCA: ch. 151, SLA 1978, did not restrict the subsistence priority to rural Alaskans.

As a consequence of *Madison,* on September 23, 1985, the Secretary advised the Governor of the State of Alaska that the State's subsistence program was no longer in compliance with ANILCA. Letter, Department of the Interior to Governor William Sheffield, dated September 23, 1985; Appendix II at 2. The Secretary further advised the State that it had until June 1, 1986, to bring its subsistence program into compliance with ANILCA; that is, "requir[ing] that the subsistence preference be limited to those rural Alaskans who customarily and traditionally make use of subsistence resources." *Id.*

In response to the foregoing, the Alaska Legislature, in early 1986, adopted Alaska's second subsistence law, ch. 52, SLA 1986.[5] This act effected multiple amendments to the earlier subsistence statute.

The main operative provision of chapter 52 is codified as AS 16.05.258 which, along with applicable statutory definitions, expressly limit subsistence hunting and fishing to rural areas of the state and those residing in rural areas.[6]

## PLAINTIFF'S CLAIMS

Based upon the respective regulation-authorizing provisions of ch. 151, SLA 1978, and ch. 52, SLA 1986, the Board of Game has promulgated a series of regulations having application to hunting moose and caribou in Game Management Unit 19 which includes Lime Village, Alaska. These regulations form the basis for plaintiffs' complaint. They are collected in Appendix I at 14–32.

The issues raised by plaintiff Bobby and the class of Lime Village residents certified by the court have changed with time and the additions, deletions, and amendment of regulations pertaining to hunting in the vicinity of Lime Village, Alaska. The issues have most recently been framed by a second amended and supplemental complaint filed on October 16, 1986 (Docket No. 39). This complaint focused upon the closed season, individual bag limit, village harvest quota, and management area restrictions imposed on Lime Village residents by the Board of Game, as well as two collateral issues which are suggested by these regulations or the potential enforcement of them. Plaintiffs contend that the regulations are arbitrary, unreasonable, and unnecessary, and that they "fail to accord to plaintiff and his class the priority for non-wasteful subsistence uses required by Section 804 of ANILCA." Second Amended & Supplemental Complaint at 9, ¶ 15.

5. The full text of ch. 52, SLA 1986, is reproduced in Appendix I at 6–11 inasmuch as it is difficult to identify the various provisions of this chapter in codified form as a part of AS 16. Hereinafter, chapter 52 is sometimes referred to for convenience as "Alaska's second subsistence law".

6. The question of whether or not the State of Alaska has defined rural areas in too restrictive a fashion to comport with the requirements of ANILCA is the subject of a recent decision by the Ninth Circuit Court of Appeals in *Kenaitze Indian Tribe v. State of Alaska,* 860 F.2d 312 (9th Cir.1988). The mandate of the court of appeals has not yet issued with respect to this decision. There is no dispute here as regards the Lime Village area being rural.

Plaintiffs seek a declaration that the closed season, bag limit, village harvest quota, and management area restrictions are unlawful. Plaintiffs seek an injunction from the court requiring the State to submit to the court, for approval and incorporation into a final judgment, regulations pertaining to the subsistence uses of moose and caribou by the plaintiffs.

The defendant denies the essential operative allegations of the complaint.

The court has under consideration four motions which will be discussed in the following order:

I. Defendant's motion for summary judgment, which addresses the principal issues raised by plaintiffs' second amended and supplemental complaint; namely, the regulation of the taking of moose and caribou through the imposition of hunting seasons and bag limits.

IIA. Plaintiffs' supplemental motion for partial summary judgment on a collateral issue, pertaining to the taking of antlerless moose and the impact of AS 16.05.780 thereon.

IIB. Defendant's motion to dismiss, also directed at the antlerless moose statute. This motion to dismiss also seeks to carve out of plaintiffs' complaint a challenge to the creation of a management area for Lime Village.

III. Plaintiffs' motion for partial summary judgment, which puts before the court a second collateral issue concerning the interpretation and application of AS 16.05.259, which statute purports to prohibit persons such as plaintiffs from asserting subsistence priority rights as a defense to state prosecution for the violation of game regulations.

## DISCUSSION

### I.

#### Regulation of the Taking of Moose & Caribou

The court takes up first the issues which are the primary focus of the case and the State's motion for summary judgment. This motion brings before the court the contentions of plaintiffs' second amended and supplemental complaint with respect to the imposition of seasons and bag limits on the taking of caribou and moose by the residents of Lime Village (the plaintiffs here). The motion is opposed. Before addressing the substance of these issues, some preliminary comments upon the nature of these proceedings, and in particular the scope and type of judicial proceedings under ANILCA § 807, 16 U.S.C. § 3117, are appropriate.

### A.

#### Judicial Enforcement of ANILCA

Section 805(a)–(c) of ANILCA, 16 U.S.C. § 3115(a)–(c), sets out the basic federal structure for implementation of the subsistence rights created by Title VIII of ANILCA on public lands within the State of Alaska. Prior to ANILCA, management of fish and wildlife on public lands in the State of Alaska had been carried out by the State of Alaska through its Department of Fish & Game. But for the provisions of ANILCA § 805(d), 16 U.S.C. § 3115(d), management of fish and game on federally owned public lands in the State of Alaska would have been given over to the Department of the Interior.

ANILCA § 805(d), 16 U.S.C. § 3115(d), in substance provides that the Secretary will not implement the *federal* subsistence priority program if the State of Alaska, "enacts and implements laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in, §§ 3113, 3114, and 3115 of [ANILCA]." ANILCA §§ 803, 804, and 805. The State of Alaska has adopted such a law in Chapter 52, Session Laws of Alaska 1986, AS 16.05.258. Section 6, ch. 52, SLA 1986, AS 16.05.258, sets forth the detailed procedure by which the Board of Game is to allocate fish and game for subsistence uses. Plaintiffs do not challenge the consistency of ch. 52, SLA 1986, with ANILCA.

AS 16.05.255 has at all times here pertinent provided generally that:

(a) The Board of Game may adopt regulations it considers advisable in accordance with the Administrative Procedure Act (AS 44.62) for

....

(2) establishing open and closed seasons and areas for the taking of game;

....

(4) setting quotas, bag limits, harvest levels, and sex, age, and size limitations on the taking of game....

Section 6, ch. 52, SLA 1986, AS 16.05.258(f), specifically provides that:

(f) Takings authorized under this section are subject to reasonable regulation of seasons, catch or bag limits, and methods and means....

Pursuant to the foregoing state authority, the Board of Game has undertaken from time to time the enactment of various regulations pertaining to the taking of moose and caribou by plaintiffs, residents of Lime Village, Alaska.

It is entirely clear that Congress understood that there would be state regulation of subsistence uses and made provision for the same in ANILCA. In this regard, ANILCA § 805(d), 16 U.S.C. § 3115(d), in authorizing state management of subsistence uses, provides in part:

Laws establishing a system of local advisory committees and regional advisory councils consistent with this section [16 U.S.C. § 3115] shall provide that the *State rule-making authority shall consider* the advice and recommendations of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses.... If a recommendation is not adopted by the State rulemaking authority, such authority shall set forth the factual basis and the reasons for its decision.

(Emphasis supplied.) Plaintiffs do not challenge the Board of Game's power to promulgate regulations.

Plaintiffs do challenge the Board of Game's various regulations which establish seasons and bag limits for the taking of moose and caribou. They contend these regulations are "arbitrary, unreasonable, and unnecessary, and they fail to accord to plaintiff and his class the priority for non-wasteful subsistence uses required by Section 804 [16 U.S.C. § 3114] of ANILCA." Plaintiffs' Second Amended and Supplemental Complaint at 9, ¶ 15.

Section 807(a) of ANILCA, 16 U.S.C. § 3117(a), provides in pertinent part:

Local residents ... aggrieved by a failure of the State ... to provide for the priority for subsistence uses set forth in section 3114 of this title (or with respect to the State as set forth in a State law of general applicability if the State has fulfilled the requirements of section 3115(d) of this title) may ... file a civil action in the United States District Court for the District of Alaska to require such actions to be taken as are necessary to provide for the priority.... In a civil action filed against the State, the court shall provide relief, other than preliminary relief, by directing the State to submit regulations which satisfy the requirements of section 3114 of this title; when approved by the court, such regulations shall be incorporated as part of the final judicial order, and such order shall be valid only for such period of time as normally provided by State law for the regulations at issue.

Defendant does not challenge this court's jurisdiction, nor does it contest this court's authority under ANILCA § 807, 16 U.S.C. § 3117, to invoke the remedy which plaintiffs seek in the event that the Board of Game regulations are found deficient or unlawful. It is therefore this court's duty to determine whether or not the Board of Game has failed to afford subsistence uses of moose and caribou the priority to which these uses are legally entitled and, if so, to require defendant, through its Board of Game, to adopt and to submit new regulations to the court for review.

■ Section 807 of ANILCA, 16 U.S.C. § 3117, does not prescribe any particular mode of analysis for an inquiry into the consistency of state rulemaking with the State's general law on subsistence. Since both ANILCA § 805(d), 16 U.S.C. § 3115(d), and AS 16.05.255(a) expressly

contemplate a formal rulemaking process, and since it is abundantly clear, from the record before the court, that the State of Alaska undertook to employ a formal rulemaking process as required by AS 16.05.-255(a), the court selects as the appropriate mode or scope of review that employed in analogous federal proceedings for the review of formal rulemaking undertaken by federal agencies.[7] Thus, "rulemaking must be set aside if arbitrary, capricious, or an abuse of discretion." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *American Tunaboat Association v. Baldrige*, 738 F.2d 1013, 1016 (9th Cir.1984). In the latter case, the Ninth Circuit Court of Appeals elaborated on the scope of review in cases such as this as follows:

> Despite the narrow scope of review under this standard and the broad discretion afforded NOAA in administering the MMPA, we affirm the decision of the district court. In doing so, we have in mind the rule that, even though an agency decision may have been supported by substantial evidence, where other evidence in the record detracts from that relied upon by the agency we may properly find the agency rule was arbitrary and capricious.

*Id.* at 1016.

More generally, but also appropriate to this case, Professor Davis in his text addressed the issues which might arise with regard to legislative rulemaking (and plainly the regulations with which we deal are such) as follows:

> Whenever a legislative body has delegated power to an agency to make rules having force of law (whether or not the delegation is explicit) the rules the agency makes pursuant to the granted power have the same force as a statute if they are valid, and they are valid if they are constitutional, within the granted power, and issued pursuant to proper procedure; a court may no more substitute its judgment as to the content of a legislative rule than it may substitute its judgment as to the content of a statute.

K.C. Davis, *Administrative Law & Government* at 119 (2d ed. 1975).

In this case, the challenge is not a constitutional one. Rather, the issues presented here have to do with whether or not the Board of Game regulations imposing seasons and bag limits upon subsistence hunters are or are not "within the grant of power" accorded the Board of Game by Alaska's second subsistence law. *Id.* The case also presents issues of whether or not the Board of Game failed to use proper procedures. The court's point of reference for purposes of evaluating the Board of Game regulations is Alaska's second subsistence law because, as discussed in the above background material, the State's regulatory scheme has "supplant[ed] the federal regulatory scheme". *Kenaitze Indian Tribe*, at 314. Regulations which are not within such grant are unlawful and must be enjoined as required by ANILCA § 807(a), 16 U.S.C. § 3117(a).

### B.

### History of Adoption of Bag Limits & Seasons for Lime Village

The underpinnings for defendant's motion for summary judgment on the issue of the lawfulness of the Board of Game's regulations pertaining to the taking of moose and caribou by plaintiffs are to be found in state law and the record of proceedings before the Board of Game. There is no disagreement between the parties as regards the makeup of that administrative record which consists of both transcribed Board proceedings and exhibits.[8]

---

7. The court recognizes that the State does not have the status of a federal agency. *Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312, 313–14 (9th Cir.1988). The scope of review here adopted is appropriate to the state's status as a "separate sovereign". *Id.* at 314.

8. During the course of its analysis of the Board of Game proceedings, the court became uncertain as to whether certain of the exhibits before the court were actually before the Board of Game. Since the court's task is to evaluate the work of the Board of Game and the consistency of that work with state law, it is not appropriate (except in unusual circumstances and for

The Alaska Board of Game is established for the purposes of "conservation and development", and is composed of seven members. AS 16.05.221(b). The board members are not state employees, and meet two or three times a year to adopt hunting regulations. The Board of Game is distinct from the Alaska Department of Fish & Game which is a full-time state agency, the powers and duties of which are set out in general in AS 16.05.020 and AS 16.05.050. The department has within it a number of divisions, including the Division of Game and the Division of Subsistence. The responsibilities of those divisions generally consist of compiling biological information about the resources, and to some extent about the harvest of resources, and providing that information to the Board of Game. The Division of Subsistence is statutorily charged with conducting socio-economic and resource use research, the data from which is provided to the Board of Game to assist it in making regulatory decisions. AS 16.05.094.

ANILCA § 805(d), 16 U.S.C. § 3115(d), mandates that any Alaska general subsistence law make provision for advisory committees and regional councils, and board consideration of their recommendations. In 5 AAC § 96, the joint Boards of Fisheries and Game have established a system of advisory committees throughout the state, pursuant to their authority under AS 16.-05.260. There are currently approximately 75 advisory committees which hold meetings and provide a vehicle for public input to the board process. Individuals are able to testify or submit written comments to the committees directly. 5 AAC §§ 96.021 and –.050. The advisory committees are permanent committees established at geographic locations throughout the state, sometimes serving more than one community, with specified representation from their constituent communities.

The joint Boards of Fisheries and Game have also established six fish and game regional councils, composed of the chairmen of the advisory committees within each region. 5 AAC § 96.220. The specified functions of the councils include holding public meetings to provide a forum for, and to assist the advisory committees in, obtaining opinions and recommendations from people interested in fish and wildlife matters "so as to achieve the greatest possible local participation in the decision-making process." 5 AAC § 96.250(b). If a regional council makes a recommendation to the board concerning subsistence uses, the board should implement that recommendation unless it determines that it is not supported by substantial evidence presented during the board meeting, violates recognized principles of conservation, or would be detrimental to subsistence. 5 AAC § 96.610(e).[9]

good cause shown) that the court consider evidence which the Board of Game did not have an opportunity to consider during the course of its proceedings. Counsel have informally advised the court that the Board of Game considered the following State exhibits now before the court in promulgating the regulations in question: State's Exhibits 1 through 5, 11, 12, 15 through 22, and 24 through 27, and plaintiffs' Exhibits 5 and 6 and 16 through 22 were before the Board of Game. Additionally, a report entitled "Land Use and Economy of Lime Village", Technical Paper No. 80 of the Alaska Department of Fish & Game, Division of Subsistence, by Priscilla Russell Kari, (the "Kari Report" herein) was before the Board of Game and has been considered to be plaintiff's Exhibit 1. The Kari Report was submitted to the court as a part of plaintiffs' motion for certification of the residents of Lime Village as a class. This document is probably the most important source of background data available to the Board of Game during its consideration of the regulations in question. With regard to these exhibits, the reader must understand that there were ongoing proceedings before the Board of Game from 1985 through April, 1987. The court deems it necessary and appropriate that the continuum of this process be understood in evaluating the final regulations of the Board of Game which are under direct consideration by the court. The State has also submitted as exhibits certain of the regulations which the Board of Game adopted from time to time here pertinent (Exhibits 9, 10, and 14) and the findings of the Board of Game in connection with certain of these regulations (State's Exhibit 14). Certain of the exhibits (State's Exhibits 6 through 8) were not considered by the Board of Game. Exhibits 6 and 8 are depositions taken in this case which were reviewed by the court solely for background purposes.

**9.** This special deference to regional council recommendations mirrors ANILCA § 805(c), 16 U.S.C. § 3115(c).

The format of the regulatory cycle of the Board of Game follows generally the same pattern for each meeting. 5 AAC § 96.610. Certain kinds of regulations are open by the board for review and, several months before the meeting date, the Board of Game puts out a "call for proposals" to the public which is distributed to the advisory committees, and to any other interested individuals or groups. A period of time follows during which the public, including the advisory committees, can submit proposals for the Board of Game either to modify or repeal existing regulations or to adopt new regulations. The advisory committees meet during that time period to develop any proposals to submit. The proposals are transmitted to the department which assembles a proposal packet and sends those back out to the public and the advisory committees for review and comment. Written comments on the proposals may be submitted once the proposal packet has been distributed. The advisory committees generally have another set of meetings during this period to review those proposals and to develop positions on them. This proposal packet is in addition to the legal notice required by the state Administrative Procedure Act, AS 44.62.190.

The Board of Game meetings are organized largely on a regional basis, so that people are able to talk about all the different species that occur in a particular region, and not have to remain at the location of the meeting for its entire duration. In proceeding through each geographic area of the state during a meeting, the board follows the same general procedure. Reports are given by the department, oral public testimony is taken, and board deliberations begin.

Shortly after this lawsuit was filed, attorneys for plaintiffs submitted a proposal to the Board of Game for consideration during its March 1985 meeting. The proposal read:

In order to provide for subsistence uses, it is proposed that with respect to moose and caribou there be no closed season and no individual bag limits for those domiciled in Lime Village in Unit 19.

The justification for the proposal was the Kari Report (plaintiffs' Exhibit 1; *see* footnote 8) and that report was available to and considered by the Board of Game during the March meeting. Plaintiffs' attorneys participated extensively in the Board of Game proceedings.

At the March 1985 meeting, the Board of Game was operating under the *Madison* decision pursuant to which, under Alaska's first subsistence law, subsistence uses of game had to be authorized for both urban and rural Alaskans. The Board of Game addressed the problem posed by *Madison* as regards meeting the subsistence needs of the residents of Lime Village by creating the Lime Village management area. 5 AAC § 88.500(6)(A); Appendix I at 30. In support of that regulation, the Board of Game adopted formal "findings". State's Exhibit 13. Based upon public testimony and the Kari Report, the Board of Game found:

(1) that the residents of Lime Village are "extremely dependent on moose and caribou in [game management unit] 19(A)." State's Exhibit 13.

(2) that "the 40 residents of Lime Village are probably the most geographically isolated and subsistence dependent people in the state." *Id.*

(3) that moose and caribou were particularly important to Lime Village residents and that these animals "supply the highest proportion of the food eaten by residents of the area." *Id.*

(4) that Lime Village residents have "customarily harvested moose and caribou on an opportunistic basis throughout the year." *Id.*[10]

(5) that the moose populations were stable and that the caribou population in the area was at a high level and growing. *Id.*

---

10. The Board of Game noted that the usual hunting periods for moose and caribou include fall, winter, and spring, and that recent short seasons in September, November, and February (which were authorized by regulation) have "not fully accommodated the opportunity for local residents to legally obtain the moose they need." State's Exhibit 13.

The Board of Game concluded that establishing a management area for Lime Village would provide a reasonable opportunity for the residents of Lime Village and other Alaskans to harvest moose in the area, and that an increase in the caribou bag limit in the area as well as an increase in the length in the moose season would be a more reasonable mechanism for providing for subsistence uses than the then current, more limited, opportunities. *Id.*

Based on these findings, caribou hunting regulations for the Lime Village management area were reviewed by the Board of Game, increasing the caribou bag limit to five for Lime Village residents. 5 AAC § 81.320 (Register 94 at 5–144d; Appendix I at 23).[11] The caribou season remained the same, August 10 through March 31. With respect to moose hunting, the Board of Game extended the season within the Lime Village management area to be open August 10 through September 25, November 20 through December 31, and February 1 through March 31, for a total of 148 days. 5 AAC § 81.320 (Register 94 at 5–144n; Appendix I at 16). Although based upon subsistence related information, these regulations were included in the generally applicable "big game" regulations. *Id.*

In June, 1985, as a consequence of the holding in *State of Alaska v. Eluska,* 698 P.2d 174 (Alaska Ct.App.1985),[12] the Board of Game met in emergency session to adopt subsistence regulations separate from the general hunting regulations in order to make the closed season regulations enforceable as to subsistence hunters. The interpretation of *Madison*—that all Alaskans were eligible to participate in subsistence uses—still applied at that time. During that meeting, the regulations governing the harvesting of moose and caribou in the Lime Village management area were not modified except that they were denominated "subsistence regulations" separate from the general hunting regulations. 5 AAC §§ 88.025(2) and 88.045(2) (Register

95 at ER–100 and ER–102; Appendix I at 24 and 17). These regulations appear to have been subsequently republished without change as permanent regulations. 5 AAC §§ 88.025(2) and 88.045(2) (Register 96 at 5–166.17 and 5–166.19; Appendix I at 25 and 18).

Because of the adoption of Alaska's second subsistence law in early 1986, an emergency meeting of the Board of Game was called in May and June of 1986 to address those regulations most in need of modification. At that meeting, the Board of Game examined the moose regulations applicable to Lime Village.

Preliminarily, the Board of Game determined that, under AS 16.05.940(25), Lime Village is a rural area and that the uses of moose by residents of that area were customary and traditional under the eight criteria outlined in 5 AAC § 99.010(b). The Board of Game then discussed various modifications which could be made to the moose hunting regulations under the new subsistence law, which were not possible under *Madison.* The major difference in the legal parameters was that the Board of Game again had the authority to identify subsistence uses on a community or area basis, and thus could once again legally authorize subsistence hunting for only those residents domiciled in Lime Village, rather than being required to authorize subsistence hunting for all Alaskans, both rural and urban residents, who wished to participate if subsistence uses were present.

The Board of Game modified the applicable regulations by closing the Lime Village management area to hunting by persons other than those domiciled within the area. Within the Lime Village management area, moose hunting was allowed (open season) from August 10 through September 25, and November 20 through March 31, a total of 179 days. 5 AAC § 88.045(2) (Register 100

11. The various regulations which, at times pertinent hereto, have been promulgated by the Board of Game with respect to the taking of moose and caribou are collected in Appendix I at 14 to 32. The regulations are most easily distinguished by reference to the "Register" number assigned to each. Lime Village is located in Game Management Unit 19A.

12. *Reversed,* 724 P.2d 514 (Alaska 1986).

at 5–166.19; Appendix I at 19). Additionally, the Board of Game raised the bag limit from one to two moose, and established a quota for the Lime Village management area of twenty moose, ten of which could be cows. *Id.*

In the finding of an emergency, which the Board of Game made in order to support the emergency regulations adopted at the June 1986 meeting, the Board of Game explained that:

> [I]n light of the recent legislation, a comprehensive review of the hunting regulations is ... required, to maximize enforceability, and to make subsistence and other hunting opportunities for the coming seasons as consistent as practicable with the legislature's intent.

State's Exhibit 19 at 1. The Board of Game explained that it had to review at that emergency meeting certain regulations which had been adopted the previous year in response to the *Eluska* decision in combination with the *Madison* decision, and also "regulations about which public comment or Department of Fish and Game recommendations were received since the regulations were adopted in June 1985."

*Id.* The Board of Game explained in the findings that at its next regular meeting on hunting regulations, then scheduled to begin March 30, 1987, that public comment would be taken. The Board of Game acknowledged that due to the emergency nature of the meetings, decisions had been made without public comment and might require amendment. The Board of Game looked toward modifying both the emergency and other regulations in response to the new legislation and "in light of public testimony and comments from the advisory committees and regional councils at future meetings, and as more information becomes available over time." State's Exhibit 19 at 2.

In April 1987, the Board of Game met. Based upon the second subsistence law, the management area for Lime Village, as well as the antlerless moose and moose quotas, were repealed. Based upon the cumulative 1985–1987 record and further deliberations at the April meeting, the Board of Game adopted the following regulations applicable to the taking of caribou and moose by subsistence hunters in the game management area in which Lime Village is located:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (2) .... | | |
| Unit 19(A) south of the Kuskokwim River and Unit 19(B) | Residents of Lime Village: Aug. 10–Mar. 31 | Five caribou. |
| | Other Subsistence Hunters: Aug. 10–Oct. 31 | One caribou. |
| | Nov. 1–Mar. 31 | Three caribou. |

5 AAC § 88.025(2) (Register 103 at 5–166.16; Appendix I at 807).

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (2) | | |
| Unit 19, for residents of Lime Village only | Aug. 10–Sept. 25 Nov. 20–Mar. 31 | Two moose, only one of which may be a cow. |
| Unit 19(A) | Sept. 1–Sept. 20 | One bull. |
| | Nov. 20–Nov. 30 Feb. 1–Feb. 10 | One moose. |

5 AAC § 88.045(2) (Register 103 at 5–166.18; Appendix I at 799).

### C.

*Consistency of Regulations
with State Law*

The Alaska Boards of Game and Fisheries, or their equivalents, have regulated the taking of fish and game by commercial operators and by the general public in Alaska for almost thirty years. There has been significant competition between commercial interests and sport hunters and fishermen. Alaska's endorsement of the subsistence lifestyle pursuant to ANILCA has required that the state game managers deal with a new, third, competing claim upon available fish and game. This task has not been easy, as the history of the development of Alaska law regarding subsistence hunting and fishing indicates. Fish and game authorities have not only had to deal with another competing application of fish and game, but one entitled to "preference over other consumptive uses...." § 6, ch. 52 SLA 1986, AS 16.05.258(c). The job of dealing with subsistence was rendered even more difficult for the Board of Game because it has been caught between the demands of the courts of the State of Alaska and the Alaska Legislature.

The court commends the Board of Game for its efforts to fit subsistence in its proper place in light of the difficult (if not impossible) situation which arose from the *Madison* decision. *Madison* opened subsistence hunting and fishing to urban as well as rural residents of Alaska under Alaska's first subsistence law. Ch. 151, SLA 1978. The result in *Madison* was, for a time, the last word on the subject under Alaska law; but the result was totally at odds with ANILCA, which defines the subsistence uses which are entitled to priority in terms of "the customary and traditional uses by rural Alaska residents of wild, renewable resources". ANILCA § 803, 16 U.S.C. § 3113.

With the enactment of Alaska's second subsistence law, ch. 52, SLA 1986, the tension created by the conflicting demands of

*Madison* and ANILCA were resolved. Subsistence usage of game was again the province of those living in "rural" Alaska. Sections 6, 10, 11, ch. 52, SLA 1986, AS 16.05.258, AS 16.05.940(25) and (30).[13] The Board of Game has now reviewed its Lime Village hunting regulations twice since the latter statute was enacted.

As discussed hereinabove, plaintiffs claim that the Board of Game regulations establishing seasons and bag limits on the taking of moose and caribou are unlawful and therefore not valid. The court concludes that the Lime Village hunting regulations are indeed unlawful.

■ As already noted, AS 16.05.255(a) grants the Board of Game the general authority to adopt regulations "it considers advisable" on the subjects of "open and closed seasons", Section 255(a)(2), and "bag limits", Section 255(a)(4). The second subsistence law grants the Board of Game specific authority to adopt regulations fixing "seasons [and] bag limits" with respect to subsistence hunting. § 6, ch. 52, SLA 1986, AS 16.05.258(f). Clearly, the Board of Game has the power to establish seasons and bag limits as to the subsistence taking of moose and caribou.

As a predicate to issuing regulations, Alaska's second subsistence law requires extensive analysis of underlying data, fact-finding, and then decision-making by the Board of Game. The board is required to "identify game populations ... that are customarily and traditionally used for subsistence in each rural area identified by the boards." § 6, ch. 52, SLA 1986, AS 16.05.-258(a). The board is required to find what portion, if any, of game populations identified under Section 258(a) "can be harvested consistent with sustained yield." Section 258(b)(1). The Board of Game is then to determine how much of that harvestable game is needed to "provide a reasonable opportunity to satisfy the subsistence uses [of game]." Section 258(b)(2). Finally,

---

**13.** So codified in AS 16.05. In ch. 52, the definition of "subsistence uses" and "rural area" were set out as AS 16.05.940(23) and (32).

upon completion of this evaluation process, the board is to adopt regulations for each game population for which a harvestable portion is determined to exist. Applicable to the facts of this case, Section 258(c) provides that:

> If the harvestable portion [of the game population] is not sufficient to accommodate all consumptive uses of the [game] population, but is sufficient to accommodate subsistence uses of the [game] population, then nonwasteful subsistence uses shall be accorded a preference over other consumptive uses, and the regulations shall provide a reasonable opportunity to satisfy the subsistence uses. If the harvestable portion is sufficient to accommodate the subsistence uses of the [game] population, then the boards may provide for other consumptive uses of the remainder of the harvestable portion.

The foregoing discussion suggests three areas of possible inquiry with respect to the regulations adopted by the Board of Game and pertaining to the taking of moose and caribou by the residents of Lime Village, Alaska:

(1) Do bag limits and seasons for the taking of moose and caribou on their face violate Alaska's second subsistence law?

(2) Has the Board of Game followed the required statutory analytical process in adopting bag limits and seasons for the taking of moose and caribou by Lime Village residents?

(3) Are the game regulations in question arbitrary or capricious in the light of the evidence in the record?

■ The text of the current Board of Game subsistence hunting regulations pertaining to the taking of caribou and moose by Lime Village residents is set forth above. *See also,* Appendix I at 799 and 807. These regulations make express provision for "residents of Lime Village". Over the relevant period of time (1980 to 1987), the regulatory provisions applicable to open seasons and bag limits for the taking of moose and caribou by Lime Village residents have moved in the direction

of expanding the seasons and the take allowed. *See* Appendix I at 795 to 812.

On their face, these regulations do not conflict with Alaska's second subsistence law. That law expressly authorizes utilization of seasonal and bag limitations upon subsistence hunting. § 6, ch. 52, SLA 1986, AS 16.05.258(f). It is neither impossible nor necessarily unlikely that the seasons or bag limits as presently constituted would fail to accommodate the customary and traditional uses of moose and caribou by Lime Village residents, both in terms of the times of taking and the quantities of meat taken. If the required analysis were performed, and with a supporting record, the season and bag limit regulations now in force would survive plaintiffs' challenge.

■ However, the court feels constrained, as a result of its review of the transcripts of the Board of Game hearings which are part of the record, to observe that the Board of Game must in the future proceed with scrupulous care and caution in imposing seasons and bag limits on subsistence hunting. Bag limits and seasons are game management tools which have seen extensive use in Alaska and nationally. These restrictions have typically, if not universally, been used to regulate sport hunting. In this case, bag limits and seasons are being applied to a very different type of game use. In its purest form, the subsistence lifestyle is quite literally the gaining of one's sustenance off the land. Typically, the sport hunter does not go hungry if the season ends without his taking any game or if he has taken and eaten his bag limit. The subsistence hunter who is without meat during a closed season or who has with his family consumed a fixed bag limit will go hungry unless some other game or fish are available and in season. Hunger knows nothing of seasons, nor is it satisfied for long after one's bag limit has been consumed.

■ The Board of Game must be attentive to the statutory definition of "subsistence hunting" and "subsistence uses". §§ 10 and 11, ch. 52, SLA 1986, AS 16.05.-

940(29) and (30).[14] When read together as is necessary, these terms define subsistence hunting in terms of:

[N]on-commercial, customary and traditional uses of wild, renewable resources by a resident domiciled in a rural area of the state for direct personal or family consumption as food ... and for the customary trade, barter, or sharing for personal or family consumption....

This definition is critical to the proper implementation of Alaska's second subsistence law and will be discussed further hereinafter. The court would emphasize at this initial stage of the review that the Board of Game should not take the court's foregoing comments to mean that the availability of one game population or of a fish stock is an element or a consideration which may be employed to restrict or reduce the demonstrated customary and traditional use of another game population. Established use of moose may not be restricted solely because fish are available. The Board of Game must determine separately the level of subsistence usage of each game population. § 6, ch. 52, SLA 1986, AS 16.05.258(b)(2).

■ If bag limits and seasons are imposed on subsistence hunting, there must be substantial evidence in the record that such restrictions are not inconsistent with customary and traditional uses of the game in question. It must be clear in the record that subsistence uses will be accommodated, as regards both the quantity or volume of use and the duration of the use. Need is not the standard. Again, it matters not that other food sources may be available at any given time or place. The standard is customary and traditional use of game.

We turn now to the second and third areas of inquiry—namely, the analysis used and procedures followed by the Board of Game in adopting regulations of subsistence hunting by Lime Village residents and the evidentiary support for those regulations. Based upon the following analysis, the court has concluded that the current

regulations for the subsistence hunting of moose and caribou, 5 AAC § 88.025 (Register 103) and 5 AAC § 88.045 (Register 103) are deficient and must be reevaluated by the Board of Game.

The great bulk of the work done by the Board of Game with respect to the evaluation of subsistence taking of moose and caribou by Lime Village residents was accomplished between 1983 and 1985. State's Exhibit 1. That work culminated in the Board of Game hearings of March 27 and 29, 1985. State's Exhibits 12A and 12B. As a result of those hearings, the Board of Game made certain findings, State's Exhibit 13, and regulations were adopted fixing seasons and bag limits for the taking of moose and caribou by Lime Village residents. 5 AAC § 81.320 (Register 94; Appendix I at 796 and 803). Although, as discussed above, some adjustments were subsequently made to the latter regulations (see Appendix I at 797–799 and 804–807), the underlying evidentiary foundation and substance of the regulations pertaining to the taking of moose or caribou by Lime Village residents for subsistence uses was and is to be found in the March 1985 proceedings. What followed was refinement and perhaps reaction to continued pressure from plaintiffs.

At the time when the foundational work for the regulations in question was accomplished by the Board of Game, Alaska's first subsistence law was still in force. Ch. 151, SLA 1978 (Appendix I at 788–791). The March 1985 proceedings of the Board of Game must have been conducted under and with reference to that statute, not Alaska's second subsistence law. The plaintiffs' claims and the regulations now in force must be evaluated under Alaska's second subsistence law which became effective June 1, 1986. Section 13, ch. 52, SLA 1986 (Appendix I at 793).

Naturally, there were substantial similarities between the first and second Alaska subsistence laws inasmuch as both sought to qualify the State to manage fish and

**14.** Thus as codified. These definitions appear in Appendix I as sections 16.05.940(23) and 16.- 05.940(33). Appendix I at 792, 793.

wildlife on public lands pursuant to ANIL-CA § 805(d), 16 U.S.C. § 3115(d). As discussed above, the first subsistence law was adopted before Congress finalized and enacted ANILCA; and the second subsistence law was not enacted by the Alaska Legislature until after the 1985 Board of Game proceedings. Not surprisingly, therefore, many of the considerations which were relevant to the 1985 proceedings are also relevant under the second Alaska subsistence law. Unfortunately, there is not an identity of considerations insofar as the questions now before the court. As discussed below, the court concludes, on the basis of the transcript of the June 1986 Board of Game proceedings, State's Exhibits 17A and 17B, that the current regulations for the taking of moose and caribou by Lime Village residents for subsistence purposes which have their genesis in the March 1985 and June 1986 board proceedings were not promulgated through the use of the procedural analysis mandated by Alaska's second subsistence law, see § 6, ch. 52, SLA 1986, AS 16.05.258, and do not have the required evidentiary support.

█ Under Section 6 of Alaska's second subsistence law, the Board of Game is to identify game populations "that are customarily and traditionally used for subsistence in each rural area identified by the boards." In the March 1985 proceedings, the Board of Game identified moose and caribou as game populations customarily and traditionally used by plaintiffs for subsistence purposes. This finding is not disputed. Likewise, there is no dispute in this case but that the plaintiffs are residents of and that Lime Village is a rural area.

In March 1985, the Board of Game also expressly found that "residents of this area have customarily harvested moose and caribou on an opportunistic basis throughout the year", that seasons established under prior regulations had not permitted Lime Village residents to "legally obtain the moose they need", and that this led to under-reporting of harvests. State's Exhibit 13. No additional evidence was taken nor were additional findings made as to the duration of plaintiffs' customary usage of moose and caribou during the June 1986 Board of Game proceedings.

The record now before the court does not provide an adequate basis for understanding or resolving the obvious conflict between a finding that Lime Village residents customarily and traditionally take moose and caribou "throughout the year" and a regulation that precludes them from taking moose during almost six months of the year and from taking caribou during just over four months of the year.[15] The court concludes that the currently operative season regulations are necessarily arbitrary for they substantially fail to accommodate what the board has determined to be the customary and traditional use of moose and caribou for subsistence purposes without first eliminating other consumptive uses. § 6, ch. 52, SLA 1986, AS 16.05.258(c).

█ Much the same analysis applies to the Board of Game's adoption of bag limits; however, for this discussion, the statutory focus shifts to some further provisions of Alaska's second subsistence law. See § 6, ch. 52, SLA 1986, AS 16.05.258(b). Section 258(b) requires that the Board of Game determine both acceptable game harvest levels and the portion of those harvests needed to satisfy subsistence uses.

Despite the fact that the March 1985 Board of Game proceedings predated the second Alaska subsistence law, the board did take evidence on and discuss harvest levels. Understandably, the Board of Game did not make the express numerical findings which the second Alaska subsistence law requires. It did find that moose populations in the Lime Village area were of "moderate density and ... relatively stable". State's Exhibit 13. It found that caribou populations were at "high levels

---

15. In fact, the Board of Game gave consideration to the availability of other food sources in restricting the taking of moose. State's Exhibit 17B at 234. As discussed hereinabove at page 778, need or other food sources are not appropriate considerations in determining customary and traditional use of game.

and [have] been growing in recent years." State's Exhibit 13.

The June 1986 Board of Game proceedings did not produce additional evidence as to harvest levels. No finding as to appropriate harvest levels for moose or caribou were made. The Board of Game appears to have adopted its 1986 revised moose and caribou regulations on the basis of the above generalized findings made in 1985 and without performing the analysis required by the second subsistence law.

What the Board of Game clearly did not do, at either the 1985 or the 1986 hearing, was come to grips with the question of how much game—how many moose and caribou—were required to accommodate the customary and traditional use of these game populations by Lime Village residents. Alaska's first subsistence law did not require the same specificity concerning the level of subsistence use as was required by Alaska's second subsistence law. *Compare* § 9, ch. 151, SLA 1978, to § 6, SLA 1986, AS 16.05.258(b)(2). In 1986, Alaska's second subsistence law did require a finding as to "how much of the harvestable portion [of moose and caribou] is needed to provide a reasonable opportunity to satisfy the subsistence uses...." This the Board of Game failed to do.

Certainly it is true that the board had some evidence before it in March of 1985 regarding the level of subsistence use of moose and caribou by Lime Village residents. However, due to a lack of findings or a clearly articulated analysis in the record, it is not possible for the court to ascertain how the board reached its determinations in 1985 and 1986 that the specified bag limits would accommodate the Lime Village subsistence usage of moose and caribou. The Board of Game findings conclude (at least as to caribou, but impliedly also as to moose) that the established bag limits "will provide a reasonable opportunity for customary levels of harvest for [Lime Village] residents". State's Exhibit 13 at 2. Without a finding or other clear articulation of the mode of analysis used as to what the subsistence use levels of moose

and caribou were, and a finding or analysis of how those use levels were translated into bag limits, the court cannot evaluate the bag limits for consistency with the second Alaska subsistence law requirement that the State provide adequately for customary and traditional usage of game and that it permit other consumptive uses only out of the excess harvestable game beyond that which is required for subsistence uses. § 6, ch. 52, SLA 1986, AS 16.05.258(c).

Because the Board of Game did not follow or articulate its use of the statutory analytical process for adopting bag limits as to subsistence hunting, those regulations are also arbitrary.

■ A specific aspect of the bag limit regulations on subsistence hunting by Lime Village residents requires further comment. There is substantial evidence in the March 1985 record that moose and caribou are taken by a few hunters who then share their take with the whole community. It appears well established by the record that customary and traditional uses of moose and caribou have a communal aspect at Lime Village. Simply put, the very young, the old, and the infirm of the community are provided with meat by the healthy adult members of the community who are skilled at hunting. It is not clear from the Board of Game findings or the discussions of the board members how this aspect of the Lime Village subsistence tradition of hunting and game-sharing interrelates with bag limits. The court is concerned that the established bag limits do not accommodate this traditional aspect of Lime Village hunting of moose and caribou.

The court makes specific mention of this point because it is necessary for the Board of Game, in reviewing the subject regulations, to give due consideration to the entirety of the definition of "subsistence uses" as set out in § 10, ch. 52, SLA 1986, AS 16.05.940(30).[16] Such uses of game are defined in terms of customary and traditional use by rural Alaska residents. That definition is further qualified in a manner which is particularly pertinent to the fore-

16. *See* footnote 14.

going discussion. The uses of game which are included for subsistence and therefore for priority purposes are "for direct personal or family consumption as food ... and for customary ... sharing for personal or family consumption...." The Board of Game must take care to accommodate the Lime Village tradition of sharing the moose and caribou they take.

■ Since the subject regulations must be reviewed, there are two other subsidiary areas of concern which the court feels obliged to comment upon. Firstly, the court is concerned that customary and traditional use data is likely to be skewed downwards due to the fact that subsistence hunting was for some early years carried on, quite probably illegally with respect to both bag limits and seasons, under sport hunting regulations and most recently under subsistence regulations which (by the Board of Game's own evaluation) failed to accommodate Lime Village area requirements. State's Exhibit 13. The Board of Game and the Division of Subsistence of the Department of Fish & Game must do their best to correct and adjust their data to take account of the under-reporting which almost surely occurred as a result of fear of criminal sanctions which could follow accurate reporting of the taking of game for community use in excess of bag limits or out of season. For their part, plaintiffs must cooperate fully with regulators, through their advisory committees and regional council, in making a record that will support the regulations which are ultimately adopted.

Secondly, and although not a primary issue in this case, some attention has focused upon the provisions of Alaska's second subsistence law which operate when the Board of Game determines that there is not sufficient harvestable game to accommodate all competing uses (e.g., both subsistence and sport hunting), but is adequate to accommodate subsistence uses. In such event, the second subsistence law dictates priority for subsistence uses over other uses, and further provides that regulations "shall provide a reasonable opportunity to satisfy the subsistence uses." § 6(c), ch. 52, SLA 1986, AS 16.05.258(c).

It is not clear to the court how the above-quoted language was intended to operate, nor how (if at all) the Board of Game has applied it in this case. The Board of Game did make express reference to the quoted statutory language in the final paragraph of its April 4, 1985, findings. State's Exhibit 13. The court understands that the determination of the quantity of game which may be harvested consistent with recognized scientific principles of game management involves professional judgment based upon surveys which cannot be exact or calculated with mathematical precision. The court further understands that successful hunting is partly skill and partly chance. It follows that subsistence hunters cannot be guaranteed that they will locate some predetermined number of moose or caribou in a given area and take them in a given period of time. All of the variables—the predictions, the skill, and chance—impact actual results. If the quoted language is reflective of the vagaries of the foregoing variables, it is no cause for particular concern at this time. However, if that language is meant to have a more specific meaning or impact on subsistence hunting, then the Board of Game must take care to evaluate and articulate the meaning they attribute to this language and take care that its implementation does not adversely impact the preference to which subsistence hunting is entitled under Alaska's second subsistence law.

D.

*Conclusion*

On the basis of the extensive briefing by both plaintiffs and defendant on the State's motion for summary judgment, and in consideration of the nature of these proceedings (review of administrative rulemaking), the court is in a position as discussed above to rule on plaintiffs' claims. The court concludes that plaintiffs are entitled to the declaratory relief they seek with respect to 5 AAC §§ 88.025 and –.045. The current version of these regulations, as well as their precursers (including the 1985 ver-

sion, 5 AAC § 81.320), were not adopted in conformity with § 6, ch. 52, SLA 1986, AS 16.05.258. They impose seasons not consistent with the board's findings as to established customs of the people of Lime Village, and thereby unacceptably restrict the preference for subsistence uses dictated by § 6, ch. 52, SLA 1986, AS 16.05.258. The regulations impose bag limits which were not demonstrably of a size sufficient to accommodate the customary taking of moose or caribou at Lime Village. The Board of Game shall review its subsistence hunting regulations for Lime Village, Alaska, and shall submit to the court for review reenacted subsistence hunting regulations in accordance with Alaska's second subsistence law and this decision.

In the absence of evidence of imminent, irreparable harm to plaintiffs, the court declines to enter an injunction against the enforcement of 5 AAC §§ 88.025 and –.045 at this time. The court does, of course, retain jurisdiction of this matter under AN-ILCA § 807(a), 16 U.S.C. § 3117(a), and, upon request of the plaintiffs, the court will review its ruling as to injunctive relief if the State has not submitted revised regulations by June 15, 1989.

## II.

### Taking of Antlerless Moose; Lime Village Management Area

■ By its motion to dismiss, the State in substance argues that the application to plaintiffs of AS 16.05.780 concerning the taking of antlerless moose and 5 AAC § 88.500(6)(A) establishing the boundaries of the Lime Village management area present issues which were either moot or not ripe for judicial review. The motion is opposed by plaintiffs.

The Alaska Board of Game, at its meeting of April 1987, repealed 5 AAC § 88.500(6)(A). Accordingly, plaintiffs' challenge of that regulation is indeed rendered moot.

■ The situation as regards AS 16.05.-780, the antlerless moose statute, presents a slightly different problem. By Section 16.05.780 of the Alaska game laws, it is provided that:

(a) The taking of antlerless moose in any game management unit or subunit or a portion of a unit or subunit is prohibited except that antlerless moose may be taken only under regulations adopted under (b) of this section after

(1) the department recommends the season be opened in that year, based on biological evidence, and

(2) a majority of active local advisory committees for that unit or subunit have recommended an opening for that year, after each has taken a vote and a majority of the members of those committees have voted in the affirmative.

(b) Pursuant to (a) of this section the board, in its regularly scheduled annual game board meeting, may adopt regulations for the taking of antlerless moose in any game management unit or subunit in any year.

This statute was enacted prior to ANIL-CA and the state's election to assume responsibility for the management of game in Alaska consistent with ANILCA. The state concedes that it is unclear how the provisions of Alaska's second subsistence law and the antlerless moose statute are to interact. State's Memorandum in Support of Motions, March 17, 1987, at 31–32. However, counsel for the State further asserts that:

The antlerless moose statute must be implemented by the advisory committees and the board [of game] in a manner consistent with the mandate that customary and traditional uses in rural Alaska are to be authorized unless sustained yield or subsistence uses themselves would be jeopardized.

*Id.* at 32.

The court has hereinabove ordered a review of subsistence hunting regulations pertaining to the taking of moose for subsistence purposes. The court takes counsel's assertion to mean that the State will, in further analysis of its regulation of the taking of moose for subsistence purposes, interpret AS 16.05.780 in a fashion which will prevent subsistence users of moose

from losing the preference to which they are entitled under § 6, ch. 52, SLA 1986, AS 16.05.258(c).

As plaintiffs point out, the antlerless moose statute, unlike the management area regulation, remains in force and presumptively binding upon the Board of Game. Thus the issue presented regarding AS 16.-05.780 is not moot; neither, however, is it ripe for a decision.

The antlerless moose issue is not ripe for decision due to the court's holding that the Board of Game's current regulations pertaining to the taking of moose do not pass muster under Alaska's second subsistence law. Stated somewhat differently, because extant season and bag limit regulations concerning the taking of moose must be reviewed by the Board of Game and potentially replaced with new regulations, it is simply not possible for the court to discern whether AS 16.05.780 will have any future adverse impact upon the preference to which subsistence moose hunting is entitled. If the bag limits adopted by the Board of Game in furtherance of this decision are constructed so as to apply Alaska's generally applicable game laws in a fashion consistent with Alaska's second subsistence law, then the plaintiffs may well have no objection based upon AS 16.05.780. Conversely, it is conceivable that in reviewing and/or revising moose seasons and bag limits, the Board of Game might in fact apply the antlerless moose statute in a fashion which would arguably deprive plaintiffs of their subsistence rights. In the latter event, the plaintiffs may present their arguments in the light of the revised regulations for the subsistence taking of moose.

Thus, in carrying out this court's order, the Board of Game must be on notice that its treatment of the taking of antlerless moose for subsistence purposes will come under scrutiny. The board must, as counsel represents it will, permit on a preference basis the taking of antlerless moose consistent with AS 16.05.258.

A word must be said as regards the State's qualification that antlerless moose seasons would be allowed "where no biological problem would exist". State's Memorandum in Support of Motions, March 17, 1987, at 33. With regard to any portion of a wildlife population (which the court understands to include antlerless moose), the taking of which must be restricted for conservation purposes, all other uses must be reduced or proscribed before subsistence use is restricted. § 6(c), ch. 52, SLA 1986, AS 16.05.258(c). The limiting or restricting of all consumptive uses including subsistence uses in an equal or roughly equal fashion is unlawful. An established subsistence use of a particular wildlife population must be afforded its statutory preference, and such use may be curtailed or proscribed only as a last resort and then only in accordance with § 6(c) of Alaska's second subsistence law. AS 16.05.258(c).

The State's motion to dismiss is granted as regards State Regulation 5 AAC § 88.500(6)(A). The State's motion to dismiss, as well as the plaintiffs' supplemental motion for partial summary judgment as to the antlerless moose statute, AS 16.05.780, are both denied; subject, however, to the court's declaration of the State's obligation as enunciated above to apply the antlerless moose statute in conformity with Alaska's second subsistence law.

### III.

### *No Subsistence Defense*

As discussed at length hereinabove, Alaska's second subsistence law created a preference for customary and traditional uses of game and made provision for the adoption of regulations to effect this right. § 6, ch. 52, SLA 1986; AS 16.05.258(f).

Alaska's second subsistence law further provided that:

In a prosecution for the taking of fish or game in violation of a statute or regulation, it is not a defense that the taking was done for subsistence uses.

§ 7, ch. 52, SLA 1986; AS 16.05.259.[17]

By motion for partial summary judgment, plaintiffs contend that Section 7 is

---

**17.** Section 7 of ch. 52, SLA 1986, was added to AS 16.05 by the Alaska Legislature with the

null and void by reason of the Supremacy Clause of the United States Constitution.[18] The motion is opposed by defendant. For the reasons discussed below, plaintiffs' motion for partial summary judgment with respect to § 7, ch. 52, SLA 1986, AS 16.05.-259, is in substance granted.

■ Plaintiffs' Supremacy Clause argument must, however, be rejected. ANILCA § 804 most certainly creates federal rights which would ordinarily supersede any conflicting state law provision. However, in ANILCA Congress made express provision for state law to be substituted for ANILCA Sections 803, 804, and 805(a)–(c), ANILCA § 805(d), 16 U.S.C. § 3115(d). As discussed above, the State of Alaska has adopted a state law that has been recognized as a substitute for ANILCA. *Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312, 314 (9th Cir.1988). Plaintiffs have not argued that the preference terms of Alaska's second subsistence law is in any respect in conflict with Sections 803, 804, or 805 of ANILCA. 16 U.S.C. §§ 3113, 3114, 3115. Congress understood and expected that the subsistence hunting priority created by ANILCA would be effected by a "State rulemaking authority". ANILCA § 805(d), 16 U.S.C. § 3115(d). The pertinent part of § 6 (AS 16.05.258(c)) provides:

(c) The boards shall adopt subsistence fishing and subsistence hunting regulations for each stock and population for which a harvestable portion is determined to exist under (b)(1) of this section.

Alaska's decision to adopt regulations covering the full scope of the subsistence right (that is, to require all subsistence hunting to be within and pursuant to regulation) is not inconsistent with ANILCA when, by necessary implication (§ 6, ch. 52, SLA 1986, AS 16.05.258(c)), those regulations are required to be consistent with Alaska's equivalent of ANILCA § 804. Because the regulations must be coextensive with the subsistence right, the "no subsistence defense" (whatever it was intended to mean—a subject to be taken up below) does not diminish the subsistence hunting rights created under ANILCA and Alaska's second subsistence law.

■ What should be, and presumably is, important to plaintiffs is that they have the opportunity to challenge the regulations which are promulgated for the purpose of giving effect to subsistence rights. Plaintiffs believe that § 7, ch. 52, SLA 1986:

[U]nambiguously and without exception, precludes any defendant in a prosecution for violating a fish or game statute or regulation from defending the prosecution on the ground that the statute or regulation being applied violates either the state or federal subsistence laws.

Plaintiffs' Brief in Support of Motion for Partial Summary Judgment at 19. For its part, the State argues similarly, urging that plaintiffs' remedy as regards regulations adopted by the Board of Game is a civil action such as this, not a subsistence defense to the criminal prosecution.

Clearly, plaintiffs have the remedy of a civil action such as this available to them under ANILCA. However, a civil action is not the only means of challenging state subsistence regulations, and the court is of the opinion that neither the Alaska Legislature nor the Alaska appellate courts have said otherwise, nor does ANILCA provide otherwise.

It must be said at the outset that § 7, ch. 52, SLA 1986, AS 16.05.259, is not unambiguous. Both plaintiffs and defendant read Section 7 to say that a defendant charged with hunting violations may not

expectation that it would be codified as "Sec. 16.05.261". This provision was renumbered by the codifier as AS 16.05.259. To avoid confusion, the "no subsistence defense" statute is herein sometimes referred to as "Section 7".

**18.** Article VI of the United States Constitution provides in pertinent part that:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

argue that the regulation under which he is charged fails to afford him the statutory subsistence rights that the legislature intended. The words used could mean that. However, the words employed by the Alaska Legislature in creating the "no subsistence defense" could also mean that a defendant may not argue for some kind of right in gross outside of and apart from validly enacted subsistence hunting regulations. The latter meaning is suggested, if not required, given the circumstances under which the provision was enacted.

The addition of the so-called "no subsistence defense" provision to Alaska's second subsistence law was the result of ongoing subsistence law litigation in the courts of the State of Alaska. Just after the Alaska Supreme Court concluded its work in *Madison,* the Alaska Court of Appeals (which has jurisdiction in the first instance of criminal appeals) was considering *State v. Eluska,* 698 P.2d 174 (Alaska Ct.App.1985), *reversed,* 724 P.2d 514 (Alaska 1986).

In May 1983, after the closure of deer hunting season in Game Unit 8, Mr. Eluska was found in possession of a freshly killed doe. He was prosecuted for violation of 5 AAC § 81.320(6) and 5 AAC § 81.140(a). The former regulation established the season and bag limit for the taking of deer in Game Unit 8 for the 1982–83 season. The latter regulation prohibited the possession of game taken in violation of AS 16 or any regulation promulgated thereunder. (This regulation in substance repeats the provisions of AS 16.05.920(a) which is still in force.) Defendant Eluska contended that he was a subsistence hunter and that extant regulations failed to adequately provide for subsistence hunting. At the time of the charges brought against Mr. Eluska, there were no regulations differentiating between sport hunting and subsistence hunting. The trial court held for defendant on the basis that the State had failed to enact subsistence regulations as required by AS 16.05.255(b).[19] The Alaska Court of Appeals in substance held for the defendant as well, and the case was remanded

for purposes of having the trial court reconsider Mr. Eluska's subsistence defense employing the parameters set out by the court of appeals.

The State appealed to the Alaska Supreme Court which, in a split decision, reversed and remanded the case to the trial court for further proceedings. The Alaska Supreme Court rejected the conclusion of the Alaska Court of Appeals that AS 16.05.255(b) required that separate regulations be promulgated governing subsistence hunting and sport hunting. In so holding, the Alaska Supreme Court held:

> We find no evidence, however, of an intent to grant any personal right to take or possess game in the absence of such regulations. Section 255(b) merely established the priority of subsistence uses *within* the regulatory scheme. If the regulations adopted by the Board fail to establish the desired priority, it is difficult to believe that the legislature intended unregulated hunting to be the result.

*Eluska,* 724 P.2d at 515 (emphasis in original; footnotes omitted).

In order to understand why the "no subsistence defense" provision was adopted, one must bear in mind that the Alaska Legislature was considering the matter after the Alaska Court of Appeals created a "subsistence defense" and before the Alaska Supreme Court rejected that defense as set out above. The Court of Appeals decision was rendered in April of 1985. Alaska's second subsistence law, including the "no subsistence defense", was enacted in early 1986 and became effective June 1, 1986. § 13, ch. 52, SLA 1986. The Alaska Supreme Court decision was not released until August 29, 1986. The legislative history of Section 7 expressly states that the "no subsistence defense" clause was a reaction to *Eluska.* State's Exhibit 20 at 8–9.

The Alaska Legislature, through enactment of §§ 6 and 7, ch. 52, SLA 1986, in substance said in response to the first

---

**19.** AS 16.05.255(b) was repealed by § 12, ch. 52, SLA 1986. The text of § 255(b) is reproduced in Appendix I at 788.

*Eluska* decision that: the Board of Game regulations shall provide a preference for subsistence hunting and, since we have made provision for subsistence hunting, a person may not subsistence hunt or claim to have done so except as permitted by these regulations. This is, of course, the same result reached by the Alaska Supreme Court in the second *Eluska* decision under Alaska's first subsistence law. As set out above, the Alaska Supreme Court concluded that the legislature had not created subsistence hunting rights absent or independent of Board of Game regulations. *Eluska*, 724 P.2d at 515. There is no suggestion in ch. 52, SLA 1986, that the intent of the legislature had changed in this respect. Indeed, the above-quoted portions of the second subsistence law in conjunction with the provisions of AS 16.05.-920(a) [20] can only be viewed as a reaffirmation by the legislature that complete provision for the statutory preference afforded subsistence hunting was to be made by regulation.

The context within which Section 7 was enacted strongly suggests that this provision was intended to preclude a defendant in a criminal proceeding from claiming a subsistence right in gross outside of and apart from validly enacted subsistence hunting regulations. The legislative history of Section 7 reinforces this conclusion. The legislature, like the Alaska Supreme Court, intended to proscribe unregulated hunting.

The legislative history of Section 7 also sheds light upon the question of whether a person charged with a subsistence hunting violation may challenge the regulation he is alleged to have violated based upon the contention that the regulation fails to afford subsistence rights. The staff of the Senate Resources Committee of the Alaska Legislature prepared a section-by-section analysis of ch. 52, SLA 1986. With respect to Section 7, the report reads:

This section does not [a]ffect AS 16.-05.930(b) which allows people to take fish and game in case of emergency. This section is also not intended to limit a person's ability to challenge a regulation that is unreasonable in its terms or fails to provide a reasonable opportunity to satisfy subsistence uses as required in proposed AS 16.05.258(c). An example might be a hunting season on caribou that was open in a particular area before or after the caribou migrated through the area, but was closed while the caribou were in the area. Such a regulation would be unreasonable on its face and would fail to provide a reasonable opportunity for subsistence uses as required by AS 16.05.258(c).

State's Exhibit 20 at 9. Clearly the legislature intended that defendants be permitted to challenge subsistence hunting regulations despite the enactment of the "no subsistence defense".

■ The State's other arguments that persons charged with violations of Alaska's subsistence hunting regulations should be precluded from challenging those regulations are without merit. Firstly, even if Section 7 were interpreted as plaintiffs and defendants suggest, the legislature may not preclude a defendant from challenging the statute or regulation under which he is charged.[21] *See Eluska*, 698 P.2d 174 (Alaska Ct.App.1985). K.C. Davis, *Administrative Law Text* § 23.05 (3d ed. 1972); *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 469 (5th Cir.1980). Davis states:

In general, a defendant in a civil or criminal proceeding brought to enforce an administrative order or regulation may defend on the ground of invalidity of the order or regulation, in absence of affirmative legislative intent to the contrary. The natural assumption is that one may not be held civilly or criminally liable for violating an invalid order or regulation. The tradition is deeply em-

**20.** AS 16.05.920(a) reads:
Unless permitted by AS 16.05—AS 16.40 or by regulation adopted under AS 16.05—AS 16.40, a person may not take, possess, [or] transport ... game....

**21.** The *Eluska* decisions are illustrative of such cases. In *Eluska,* the State appears not to have contended that Mr. Eluska was foreclosed from questioning the regulations under which he was being prosecuted.

bedded that even statutes may be challenged by resisting enforcement.

K.C. Davis, *Administrative Law Text* § 23.05 at 446–447 (footnotes omitted). As set out above, the intent of the Alaska Legislature was that such challenges be permitted.

Secondly, no provision of ANILCA precludes the defendant in a criminal case from challenging the State's subsistence hunting regulations. ANILCA § 807(a) deals exclusively with civil actions and creates an "exhaustion precondition" only with respect to bringing a civil action. Section 807(a) does not address criminal proceedings for the violation of regulations promulgated by the State in furtherance of its election to assume ANILCA responsibilities. Even if the exhaustion requirement were applicable, there are no such administrative remedies attendant to criminal proceedings.

Similarly, the State's position is not aided by ANILCA § 807(c), 16 U.S.C. § 3117(c). Section 807(c) makes the judicial remedy provided by Section 807(a) the exclusive "Federal judicial remedy" for those "aggrieved by a failure of the State to provide for the priority of subsistence uses set forth in Section 804." Section 807(c) does not address criminal prosecutions in *state* courts. Even assuming that it could do so, Congress has not purported to substitute a civil action such as this for the right of a defendant in a criminal case to challenge the validity of the statute or regulation under which he is charged.

Neither ANILCA nor Alaska's second subsistence law preclude a defendant from challenging the validity of a hunting regulation as a defense to a criminal prosecution.[22]

The State's suggestion that this court's rejection of Section 7 as a basis for precluding challenges to subsistence regulations will lead to chaos is essentially an emotional argument without substance. Certainly it has been difficult for the State, and in particular the Board of Game, to find its way through the maze of conflicting demands placed upon it as a result of the several Alaska subsistence statutes and the judicial decisions made under them. The court does not wish to minimize the difficulty which may be presented through the assertion of a subsistence defense in the form of a challenge to subsistence regulations brought in the context of a criminal prosecution. However, to the extent that we deal here with this issue, the court believes that the State's vision of problems which may come from this court's holding are exaggerated.

Certainly there may be a number of claims at the outset. However, as a body of precedents is developed, it can easily be predicted that the difficulties will diminish, at least through the application of the principle of *stare decisis*. Once a given regulatory concept has been thoroughly litigated, the matter should be ended unless there are regulatory changes. The court is not unmindful that recent history indicates such changes may be frequent; but here also, the court is not persuaded that the

---

**22.** Not before this court, and therefore not addressed or considered, is the situation where a person is charged with a game violation other than one based upon subsistence hunting, where the defendant seeks to defend on the basis of a claim that he was subsistence hunting. If one were so charged and could demonstrate that he was entitled to the benefit of a specific subsistence hunting regulation, this would appear to be an adequate defense. But suppose, for the sake of discussion, that a resident of rural Alaska were to take a moose contrary to sport hunting regulations and in an area where there was no subsistence hunting regulation permitting the taking of such wild game. Seemingly this would present the identical situation as arose in *Eluska*.

This court shares the concern of the Alaska Supreme Court that assertion of a subsistence defense in a case where there is no applicable subsistence regulation, if permitted, would result in unregulated hunting which could in the long run be contrary to the purposes of ANILCA and Alaska's second subsistence law. Such a case will not arise in the future if advisory committees, regional councils, and the Board of Game operate as they are intended to and give full effect to § 6, ch. 52, SLA 1986, AS 16.05.258.

For now, and because this case does not present or develop the latter problem, the court need not address it and expresses no opinion as to whether or not § 7, ch. 52, SLA 1986, AS 16.05.259, would be enforceable in a prosecution brought in the absence of an applicable subsistence hunting regulation.

problem is as horrendous as the State suggests. If the work of local advisory committees and regional councils and the Board of Game is effectively done, and if the board's decisions are well supported and documented, the temptation or need to challenge those regulatory decisions will be minimized along with the prospects for the success of such challenges.

■ Be the foregoing as it may, the State of Alaska cannot authorize the Board of Game to adopt regulations which can lead to criminal sanctions and make them incontestable by defendants when the State seeks to enforce the regulations. Plaintiffs and defendant's contention that Section 7 (AS 16.05.259) so operates is rejected on the foregoing authorities and for the foregoing reasons. Plaintiffs or persons similarly situated are entitled to test the validity of subsistence hunting regulations in a criminal prosecution seeking to enforce those regulations. Although the court's analysis of Section 7 is different from that of the plaintiffs, the result favors plaintiffs and, therefore, plaintiffs' motion for partial summary judgment on the "no subsistence defense" is in substance granted.

## APPENDIX I

### LAWS OF ALASKA
1978
Chapter No. 151
Source *SCS CSHB 960* am S

### AN ACT
Relating to fish and game management.

---

**BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF ALASKA:**

* Section 1. INTENT. The legislature finds that there is a need to develop a statewide policy on the utilization, development and conservation of fish and game resources, and to recognize that those resources are not inexhaustible and that preferences must be established among beneficial users of the resources. The legislature further determines that it is in the public interest to clearly establish subsistence use as a priority use of Alaska's fish and game resources and to recognize the needs, customs and traditions of Alaskan residents. The legislature further finds that beneficial use of those resources by all state residents should be carefully monitored and regulated, with as much input as possible from the affected users, so that the viability of fish and game resources is not threatened and so that resources are conserved in a manner consistent with the sustained-yield principle.

* Sec. 2. AS 16.05.090 is amended by adding a new subsection to read:

(c) There is established in the Department of Fish and Game a section of subsistence hunting and fishing.

* Sec. 3. AS 16.05 is amended by adding a new section to read:

Sec. 16.05.094. DUTIES OF SECTION OF SUBSISTENCE HUNTING AND FISHING. The section of subsistence hunting and fishing shall

(1) compile existing data and conduct studies to gather information, including data from subsistence users, on all aspects of the role of subsistence hunting and fishing in the lives of the residents of the state;

(2) quantify the amount, nutritional value, and extent of dependence on food acquired through subsistence hunting and fishing;

(3) make information gathered available to the public, appropriate agencies, and other organized bodies;

(4) assist the department, the Board of Fisheries, and the Board of Game in determining what uses of fish and game, as well as which users and what methods, should be termed subsistence uses, users, and methods;

(5) evaluate the impact of state and federal laws and regulations on subsistence hunting and fishing and, when corrective action is indicated, make recommendations to the department;

(6) make recommendations to the Board of Game and the Board of Fisheries regarding adoption, amendment and repeal of regulations affecting subsistence hunting and fishing;

(7) participate with other divisions in the preparation of statewide and regional management plans so that those plans reorganize and incorporate the needs of subsistence users of fish and game.

* Sec. 4. AS 16.05.251 is amended by adding a new subsection to read:

(b) The Board of Fisheries shall adopt regulations in accordance with the Administrative Procedure Act (AS 44.62) permitting the taking of fish for subsistence uses unless the board determines, in accordance with the Administrative Procedure Act, that adoption of such regulations will jeopardize or interfere with the maintenance of fish stocks on a sustained-yield basis. Whenever it is necessary to restrict the taking of fish to assure the maintenance of fish stocks on a sustained-yield basis, or to assure the continuation of subsistence uses of such resources, subsistence use shall be the priority use. If further restriction is necessary, the board shall establish restrictions and limitations on and priorities for these consumptive uses on the basis of the following criteria:

(1) customary and direct dependence upon the resource as the mainstay of one's livelihood;

(2) local residency; and

(3) availability of alternative resources.

* Sec. 5. AS 16.05.255 is amended by adding a new subsection to read:

(b) The Board of Game shall adopt regulations in accordance with the Administrative Procedure Act (AS 44.62) permitting the taking of game for subsistence uses unless the board determines, in accordance with the Administrative Procedure Act, that adoption of such regulations will jeopardize or interfere with the maintenance of game resources on a sustained-yield basis. Whenever it is necessary to restrict the taking of game to assure the maintenance of game resources on a sustained-yield basis, or to assure the continuation of subsistence uses of such resources, subsistence use shall be the priority use. If further restriction is necessary, the board shall establish restrictions and limitations on and priorities for these consumptive uses on the basis of the following criteria:

(1) customary and direct dependence upon the resources as the mainstay of one's livelihood;

(2) local residency; and

(3) availability of alternative resources.

* Sec. 6. AS 16.05.257(a) is amended to read:

(a) The Board of Game, at its regularly scheduled annual meeting and other meetings held under authority of sec. 300(a) of this chapter, shall consider and may adopt regulations providing for subsistence hunting in a game management unit or subunit or a portion of a unit or subunit upon

(1) recommendation of the department, based on biological evidence;

(2) the recommendation of the active local advisory committees for that game management unit or subunit or a portion of a unit or subunit;

(3) the written petition of not less than 100 interested residents of that game management unit or subunit; or

(4) the written petition of not less than 25 interested residents of an area which is requested for establishment as a subsistence area within a game management unit or subunit.

* Sec. 7. AS 16.05.257(c) is repealed and re-enacted to read:

(c) No regulations may be adopted by the Board of Game under (a), (b) or (f) of this section unless, in addition to the requirements of AS 44.62.180–44.62.290, the department

(1) holds public hearings, after reasonable notice, at least 30 days before the meeting at which the regulation is to be adopted, with at least one of the hearings being held in close proximity to the area potentially affected;

(2) presents at the hearings the information provided for in (e) of this section;

(3) makes the information provided for in (e) of this section available to the appropriate advisory committees and to petitioners if consideration of adoption of regulations was prompted by petitions under (a)(3) or (4) of this section; comments shall be received by the board until 10 days before any adoption of regulations.

* Sec. 8. AS 16.05.257(d) is amended to read:

(d) A petition submitted under (a)(3)–(4) of this section shall contain a complete description of the area requested as a subsistence area and a specification of the species within the area considered necessary for subsistence use. A petition or recommendation made under (a)(2), (3) or (4) of this section must be filed with the department at least 75 days before the meeting of the board at which the petition or recommendation is to be considered.

* Sec. 9. AS 16.05.257(e) is repealed and re-enacted to read:

(e) The department shall investigate, by collecting existing data, and, when necessary, conducting new studies, every petition or recommendation made under (a)(2), (3) or (4) of this section to the extent practicable within the time available and provide the following information:

(1) the concentration of the species to be affected and carrying capacity of the area to be affected;

(2) the current hunting practices in the area, including numbers of animals taken and by what methods and means and whether the take is subsistence or recreational;

(3) the dependence of persons in the area for subsistence use of a species;

(4) the population trends of the affected fish and game in the area;

(5) whether the affected fish and game population is able to support a nonsubsistence harvest; and

(6) other information considered necessary by the section of subsistence hunting and fishing.

* Sec. 10. AS 16.05.257(h)(1) is amended to read:

(1) "subsistence hunting" means the taking of game animals by a state resident for subsistence uses by means defined by the Board of Game;

* Sec. 11. AS 16.05.257(h)(2) is repealed and re-enacted to read:

(2) "subsistence hunting area" means an area in which only subsistence hunting of the affected species is permitted and which is managed for maximum food potential.

* Sec. 12. AS 16.05.257 is amended by adding a new subsection to read:

(i) The Board of Game may make no decision denying, creating or changing a subsistence hunting area unless based on specific written findings of fact regarding all the information provided in accordance with (e) of this section.

* Sec. 13. AS 16.05.930 is amended by adding a new subsection to read:

(e) This chapter does not prevent the traditional barter of fish and game taken by subsistence hunting or fishing, except that the commissioner may prohibit the barter of subsistence-taken fish and game by regulation, emergency or otherwise, if a determination on the record is made that the barter is resulting in a waste of the resource, damage to fish stocks or game populations, or circumvention of fish or game management programs.

* Sec. 14. AS 16.05.940(17) is amended to read:

(17) "subsistence fishing" means the taking, fishing for, or possession of fish, shellfish, or other fisheries resources for subsistence uses with gill net, seine, fish wheel, long line, or other means defined by the Board of Fisheries;

* Sec. 15. AS 16.05.940 is amended by adding new paragraphs to read:

(26) "subsistence uses" means the customary and traditional uses in Alaska of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter or sharing for personal or family consumption; for the purposes of this paragraph, "family" means all persons related by blood, marriage, or adoption, and any person living within the household on a permanent basis;

(27) "barter" means the exchange or trade of fish or game, or their parts, taken for subsistence uses

(A) for other fish or game or their parts; or

(B) for other food or for nonedible items other than money if the exchange is of a limited and noncommercial nature.

Approved by the Governor: July 12, 1978
Actual Effective Date: October 10, 1978

––––––

AN ACT

Relating to the taking of fish and game for subsistence and personal use; and providing for an effective date.

––––––

* Section 1. AS 16.05.251(a)(6) is amended to read:

(6) classifying as commercial fish, sport fish, personal use fish, subsistence fish, or predators or other categories essential for regulatory purposes;

* Sec. 2. AS 16.05.251(a) is amended by adding a new paragraph to read:

(12) regulating commercial, sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries.

* Sec. 3. AS 16.05.251 is amended by adding new subsections to read:

(d) Regulations adopted under (a) of this section must, consistent with sustained yield and the provisions of AS 16.05.258, provide a fair and reasonable opportunity for the taking of fishery resources by personal use, sport, and commercial fishermen.

(e) The Board of Fisheries shall establish criteria for the allocation of fishery resources among personal use, sport, and commercial fishing. The criteria may, as appropriate to particular allocation decisions, include factors such as

(1) the history of each personal use, sport, and commercial fishery;

(2) the number of residents and nonresidents who have participated in each fishery in the past and the number of residents and nonresidents who can reasonably be expected to participate in the future;

(3) the importance of each fishery for providing residents the opportunity to obtain fish for personal and family consumption;

(4) the availability of alternative fisheries resources;

(5) the importance of each fishery to the economy of the state;

(6) the importance of each fishery to the economy of the region and local area in which the fishery is located;

(7) the importance of each fishery in providing recreational opportunities for residents and nonresidents.

* Sec. 4. AS 16.05.255(a) is amended by adding a new paragraph to read:

(10) regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game.

* Sec. 5. AS 16.05.255 is amended by adding a new subsection to read:

(d) Regulations adopted under (a) of this section shall provide that, consistent with the provisions of AS 16.05.258, the taking of moose, deer, elk, and caribou by residents for personal or family consumption has preference over taking by nonresidents.

* Sec. 6. AS 16.05 is amended by adding new sections to read:

Sec. 16.05.258. SUBSISTENCE USE AND ALLOCATION OF FISH AND GAME.

(a) The Board of Fisheries and the Board of Game shall identify the fish stocks and game populations, or portions of stocks and populations, that are customarily and traditionally used for subsistence in each rural area identified by the boards.

(b) The boards shall determine

(1) what portion, if any, of the stocks and populations identified under (a) of this section can be harvested consistent with sustained yield; and

(2) how much of the harvestable portion is needed to provide a reasonable opportunity to satisfy the subsistence uses of those stocks and populations.

(c) The boards shall adopt subsistence fishing and subsistence hunting regulations for each stock and population for which a harvestable portion is determined to exist under (b)(1) of this section. If the harvestable portion is not sufficient to accommodate all consumptive uses of the stock or population, but is sufficient to accommodate subsistence uses of the stock or population, then nonwasteful subsistence uses shall be accorded a preference over other consumptive uses, and the regulations shall provide a reasonable opportunity to satisfy the subsistence uses. If the harvestable portion is sufficient to accommodate the subsistence uses of the stock or population, then the boards may provide for other consumptive uses of the remainder of the harvestable portion. If it is necessary to restrict subsistence fishing or subsistence hunting in order to assure sustained yield or continue subsistence uses, then the preference shall be limited, and the boards shall distinguish among subsistence users, by applying the following criteria:

(1) customary and direct dependence on the fish stock or game population as the mainstay of livelihood;

(2) local residency; and

(3) availability of alternative resources.

(d) The boards may adopt regulations consistent with this section that authorize taking for nonsubsistence uses a stock or population identified under (a) of this section.

(e) Fish stocks and game populations, including bison, or portions of fish stocks and game populations, not identified under (a) of this section may be taken only under nonsubsistence regulations.

(f) Takings authorized under this section are subject to reasonable regulation of seasons, catch or bag limits, and methods and means. Takings and uses of resources authorized under this section are subject to AS 16.05.831 and AS 16.30.

* Sec. 7. AS 16.05 is amended by adding a new section to read:

Sec. 16.05.261. NO SUBSISTENCE DEFENSE. In a prosecution for the taking of fish or game in violation of a statute or regulation, it is not a defense that the taking was done for subsistence uses.

* Sec. 8. AS 16.05.330 is amended by adding a new subsection to read:

(c) The Board of Fisheries and the Board of Game may adopt regulations providing for the issuance and expiration of subsistence permits for areas, villages, communities, groups, or individuals as needed for authorizing, regulating and monitoring the subsistence harvest of fish and game. The boards shall adopt these regulations when the subsistence preference requires a reduction in the harvest of a fish stock or game population by nonsubsistence users.

* Sec. 9. AS 16.05.940(22) is amended to read:

(22) "subsistence fishing" means the taking of, fishing for, or possession of fish, shellfish, or other fisheries resources by a resident domiciled in a rural area of the state for subsistence uses with gill net, seine, fish wheel, long line, or other means defined by the Board of Fisheries;

* Sec. 10. AS 16.05.940(23) is amended to read:

(23) "subsistence uses" means the noncommercial, customary and traditional uses [IN ALASKA] of wild, renewable resources by a resident domiciled in a rural area of the state for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal or family consumption; in [FOR THE PURPOSES OF] this paragraph, "family" means [ALL] persons related by blood, marriage, or adoption, and a [ANY] person living in [WITHIN] the household on a permanent basis;

* Sec. 11. AS 16.05.940 is amended by adding new paragraphs to read:

(28) "domicile" means the true and permanent home of a person from which the person has no present intention of moving and to which the person intends to return whenever the person is away; domicile may be proved by presenting evidence acceptable to the boards of fisheries and game;

(29) "fish stock" means a species, subspecies, geographic grouping or other category of fish manageable as a unit;

(30) "game population" means a group of game animals of a single species or subgroup manageable as a unit;

(31) "personal use fishing" means the taking, fishing for, or possession of finfish, shellfish, or other fishery resources, by Alaska residents for personal use and not for sale or barter, with gill or dip net, seine, fish wheel, long line, or other means defined by the Board of Fisheries;

(32) "rural area" means a community or area of the state in which the noncommercial, customary, and traditional use of fish or game for personal or family consumption is a principal characteristic of the economy of the community or area;

(33) "subsistence hunting" means the taking of, hunting for, or possession of game by a resident domiciled in a rural area of the state for subsistence uses by means defined by the Board of Game.

* Sec. 12. AS 16.05.251(b), 16.05.255(b), and 16.05.257 are repealed.

* Sec. 13. This Act takes effect June 1, 1986.

---

## FISH AND GAME

5 AAC 98.005
5 AAC 99.010
Register 82, July 1982

### CHAPTER 98.
### AREAS OF JURISDICTION FOR ANTLERLESS MOOSE SEASONS

Article
1. Areas of Jurisdiction (5 AAC 98.005)

### ARTICLE 1.
### AREAS OF JURISDICTION

Section
5. Areas of jurisdiction for antlerless moose seasons

**5 AAC 98.005. AREAS OF JURISDICTION FOR ANTLERLESS MOOSE SEASONS.** For the purpose of implementing AS 16.05.780, the areas of jurisdiction established for advisory committees are those specified in 5 AAC 97.005(3)

(1) repealed 12/13/79;

(2) repealed 12/13/79;

(3) repealed 12/13/79;

(4) repealed 12/13/79.

Authority: AS 16.05.260
AS 16.05.780

## PART 8.
## SUBSISTENCE HUNTING, FISHING, AND TRAPPING

Chapter
99. Subsistence Uses

## CHAPTER 99.
## SUBSISTENCE USES

Section
10. Joint Boards of Fisheries and Game subsistence procedures
20. Definitions

**5 AAC 99.010. JOINT BOARDS OF FISHERIES AND GAME SUBSISTENCE PROCEDURES.** (a) In applying a subsistence priority, the Board of Fisheries and the Board of Game will provide for conservation and development of Alaska's fish and game resources according to the following procedures:

(1) each board will assess the biological status of fish or game resources and determine whether a surplus may be harvested during a regulatory year consistent with the conservation and development of the resources on the sustained yield principle and compatible with the public interest;

(2) each board will identify subsistence uses of fish or game resources, recognizing that subsistence uses are customary and traditional uses by rural Alaska residents for food, shelter, fuel, clothing, tools, transportation, making of handicrafts, customary trade, barter and sharing.

(b) Customary and traditional subsistence uses by rural Alaska residents will be identified by use of the following criteria:

(1) a long-term, consistent pattern of use, excluding interruption by circumstances beyond the user's control such as regulatory prohibitions;

(2) a use pattern recurring in specific seasons of each year;

(3) a use pattern consisting of methods and means of harvest which are characterized by efficiency and economy of effort and cost, and conditioned by local circumstances;

(4) the consistent harvest and use of fish or game which is near, or reasonably accessible from, the user's residence;

(5) the means of handling, preparing, preserving, and storing fish or game which has been traditionally used by past generations, but not excluding recent technological advances where appropriate;

(6) a use pattern which includes the handing down of knowledge of fishing or hunting skills, values and lore from generation to generation;

(7) a use pattern in which the hunting or fishing effort or the products of that effort are distributed or shared among others within a definable community of persons, including customary trade, barter, sharing, and gift-giving; customary trade may include limited exchanges for cash, but does not include significant commercial enterprises; a community may include specific villages or towns, with a historical preponderance of subsistence users, and encompasses individuals, families, or groups who in fact meet the criteria described in this subsection; and

(8) a use pattern which includes reliance for subsistence purposes upon a wide diversity of the fish and game resources of an area, and which provides substantial economic, cultural, social, and nutritional elements of the subsistence user's life.

(c) After identifying subsistence uses based upon the criteria set out in (b) of this section, each board will determine the approximate amount of fish or game necessary to

provide fully for reasonable opportunities to engage in these customary and traditional uses.

(d) Each board will adopt regulations that provide an opportunity for the subsistence taking of fish or game resources in amounts sufficient to provide for the customary and traditional uses identified in (b) of this section, and consistent with sound conservation and management practices. In no instance may the subsistence taking jeopardize or interfere with the maintenance of a specific fish stock or game population on a sustained yield basis.

(e) Each board will, in its discretion, adopt regulations that provide an opportunity for non-subsistence uses of the resource, to the extent that the non-subsistence uses do not jeopardize or interfere with the conservation and development of fish or game resources on a sustained-yield basis, or with the opportunity for taking these resources for customary and traditional subsistence uses as provided in (d) of this section.

(f) When circumstances such as increased numbers of users, weather, predation, or loss of habitat may jeopardize the sustained yield of a fish stock or game population, each board will exercise all practical options for restricting non-subsistence harvest before subsistence uses are restricted. If all available restrictions for non-subsistence uses have been implemented and further restrictions are needed, each board will reduce the take for subsistence uses in a series of graduated steps, by giving maximum protection to subsistence users who

(1) live closest to the resource;

(2) have the fewest available alternative resources; and

(3) have the greatest customary and direct dependence upon the resource.

(g) In no event, however, will a board allow uses which will jeopardize or interfere with the conservation and management of fish stocks or game populations on a sustained-yield basis. (Eff. 5/30/82, Reg. 82)

Authority: AS 16.05.251(b)
AS 16.05.255(b)

**5 AAC 99.020. DEFINITIONS.** In this chapter, "rural" means outside the road connected area of a borough, municipality, or other community with a population of 7,000 or more, as determined by the Alaska Department of Community and Regional Affairs. (Eff. 5/30/82, Reg. 82)

Authority: AS 16.05.251(b)
AS 16.05.255(b)

FISH AND GAME

5 AAC 81.320

Register 90, July 1984

**5 AAC 81.320. BIG GAME HUNTING.** Following are the seasons and bag limits on big game, and the units or portions of units to which they apply: . . .

. . . .

Register 90, July 1984 FISH AND GAME 5 AAC 81.320

| UNITS | OPEN SEASONS | BAG LIMITS |
|---|---|---|
| Remainder of Unit 18 | Sept. 1–Sept. 30<br>Nov. 15–Dec. 31 | One bull. |
| Unit 19(A) | Sept. 1–Sept. 25<br>Nov. 20–Nov. 30<br>Feb. 1–Feb. 10 | One moose; however, antler-less moose may be taken only from Nov. 20–Nov. 30, and from Feb. 1–Feb. 10. |
| Unit 19(B) | Sept. 1–Sept. 30 | One bull. |

| UNITS | OPEN SEASONS | BAG LIMITS |
|---|---|---|
| Unit 19(C) | Sept. 1–Oct. 10 | One bull. |
| Unit 19(D), that portion of the Upper Kuskokwim Controlled Use Area within the drainage of the North Fork upstream from the confluence of the North and South Forks, to the mouth of the Swift Fork | Sept. 1–Sept. 30 | One bull. |
| Unit 19(D), the remainder of the Upper Kuskokwim Controlled Use Area | Sept. 1–Sept. 30 Dec. 1–Feb. 28 | One bull. |
| Remainder of Unit 19(D) | Sept. 1–Sept. 30 Dec. 1–Dec. 15 | One bull. |
| Unit 20(A), that portion lying north of the Fairbanks North Star Borough southern boundary (south line of T7S Fairbanks Meridian) and that portion of Unit 20(A) lying north of the Rex Trail and east of the Nenana River | Sept. 1–Sept. 30 | One bull. |
| Remainder of Unit 20(A), and Unit 20(C) | Sept. 1–Sept. 20 | One bull. |
| Unit 20(B), that portion within the Fairbanks Management Area (5 AAC 81.238(8)) | Sept. 1–Sept. 30 Nov. 21–Nov. 27 | One bull. |
| Unit 20(B), that portion within the Minto Management Area (5 AAC 81.238(1)) | Sept. 17–Sept. 21 Jan. 10–Feb. 28 | One bull by registration permit only. 100 permits will be issued. Seven bulls may be taken during the Sept. 17–Sept. 21 season, and eight bulls during the Jan. 10–Feb. 28 season. See 5 AAC 81.055 and separate registration permit hunt supplement. |
| Remainder of Unit 20(B) | Sept. 1–Sept. 20 | One bull. |
| Unit 20(D), that portion lying south of the north bank of the Tanana River, and west of the east bank of the Johnson River, except the Delta Junction Management Area | Sept. 1–Sept. 6 | One bull. |
| Unit 20(D), that portion lying south of the north bank of the Tanana River, and east of the east bank of the Johnson River | Sept. 1–Sept. 20 | One bull. |

FISH AND GAME

5 AAC 81.320

Register 94, July 1985

**5 AAC 81.320. BIG GAME HUNTING.** Following are the seasons and bag limits for big game, and the units or portions of units in which they apply: ...

. . . .

| UNITS | OPEN SEASONS | BAG LIMITS |
|---|---|---|
| Remainder of Unit 17(B) | Aug. 20–Sept. 4<br>Sept. 5–Sept. 15<br>Dec. 10–Dec. 31 | One bull; however, during the period Aug. 20–Sept. 4, moose may be taken by registration permit only. See 5 AAC 81.055 and separate registration permit hunt supplement. |
| Unit 17(C), that portion including the Iowithla drainage and Sunshine Valley | Aug. 20–Sept. 4 )<br>Sept. 5–Sept. 15 )<br>)<br>) | One bull; however, during the period Aug. 20–Sept. 4 moose may be taken by registration permit only. See 5 AAC 81.055 |
| Remainder of Unit 17(C) | Aug. 20–Sept. 4 )<br>Sept. 5–Sept. 15 )<br>Dec. 10–Dec. 31 ) | and separate registration permit hunt supplement. |
| Unit 18, that portion north and west of a line from Cape Romanzof to Kuzilvak Mountain, to Mountain Village, and west of, but not including, the drainage of the Andreafsky River | Sept. 1–Sept. 20 | One bull. |
| Remainder of Unit 18 | Sept. 1–Sept. 30<br>Feb. 1–Feb. 10 | One bull. |
| Unit 19(A), the Lime Village Management Area only (5 AAC 81.238(10)) | Aug. 10–Sept. 25<br>Nov. 20–Dec. 31<br>Feb. 1–Mar. 31 | One moose; however, no person may transport a moose out of this area, except one bull if it is taken during the Sept. 1–Sept. 25 season. |
| Unit 19(A), excluding the Lime Village Management Area | Sept. 1–Sept. 25<br>Nov. 20–Nov. 30<br>Feb. 1–Feb. 10 | One moose; however, antlerless moose may be taken only from Nov. 20–Nov. 30, and from Feb. 1–Feb. 10. |
| Unit 19(B) | Sept. 1–Sept. 30 | One bull. |
| Unit 19(C) | Sept. 1–Oct. 10 | One bull. |
| Unit 19(D), that portion of the Upper Kuskokwim Controlled Use Area within the drainage of the North Fork upstream from the confluence of the North and South Forks, to the mouth of the Swift Fork | Sept. 1–Sept. 30 | One bull. |
| Unit 19(D), the remainder of the Upper Kuskokwim Controlled Use Area | Sept. 1–Sept. 30<br>Dec. 1–Feb. 28 | One bull. |
| Remainder of Unit 19(D) | Sept. 1–Sept. 30<br>Dec. 1–Dec. 15 | One bull. |

FISH AND GAME
EMERGENCY REGULATIONS

5 AAC 88.040
5 AAC 88.045
Register 95, October 1985

**5 AAC 88.040. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR GOAT.** There is no open season for goat in Units 12, 19, 20, 21, 24, and 25. (Expires November 1, 1985 unless made "permanent" by the adopting agency) (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.045. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR MOOSE.** Subsistence hunting seasons and bag limits for moose are

| UNITS | OPEN SEASON | BAG LIMIT |
|---|---|---|
| **(1)** | | |
| Unit 12 east of the Nabesna River and south of the Winter trail from Pickerel Lake southeast to the Canadian border | Sept. 1–Sept. 30 | One bull with an antler spread of at least 50 inches or with at least four brow tines on at least one antler. |
| Unit 12, the Little Tok River drainage upstream from and including that east bank tributary whose headwaters are across the divide from the headwaters of Tuck Creek | Sept. 1–Sept. 10 | One bull. |
| Remainder of Unit 12 | Sept. 1–Sept. 20 | One bull. |
| **(2)** | | |
| Unit 19(A), excluding the Lime Village Management Area | Sept. 1–Sept. 25 Nov. 20–Nov. 30 Feb. 1–Feb. 10 | One moose; however, antlerless moose may be taken only from Nov. 20–Nov. 30, and from Feb. 1–Feb. 10. |
| Unit 19(A) within the Lime Village Management Area | Aug. 10–Sept. 25 Nov. 20–Dec. 31 Feb. 1–Mar. 31 | One moose; only bull moose taken during Sept. 1–Sept. 25 may be transported out of this area; cow moose may not be transported out of this area. |
| Unit 19(B) | Sept. 1–Sept. 30 | One bull. |
| Unit 19(C) | Sept. 1–Oct. 10 | One bull. |
| Unit 19(D), that portion of the Upper Kuskokwim Controlled Use Area within the North Fork drainage from the South Fork upstream to the mouth of the Swift Fork | Sept. 1–Sept. 30 | One bull. |
| Unit 19(D), the remainder of the Upper Kuskokwim Controlled Use Area | Sept. 1–Sept. 30 Dec. 1–Feb. 28 | One bull. |
| Remainder of Unit 19(D) | Sept. 1–Sept. 30 Dec. 1–Dec. 15 | One bull. |

---

**5 AAC 88.040. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR GOAT.** There is no open season for goat in Units 12, 19, 20, 21, 24, and 25. (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.045. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR MOOSE.** Subsistence hunting seasons and bag limits for moose are as follows:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| **(1)** | | |
| Unit 12 east of the Nabesna River and south of the winter trail from Pickerel Lake southeast to the Canadian border | Sept. 1–Sept. 30 | One bull with an antler spread of at least 50 inches or with at least four brow tines on at least one antler. |
| Unit 12, the Little Tok River drainage upstream from and including that east bank tributary whose headwaters are across the divide from the headwaters of Tuck Creek | Sept. 1–Sept. 10 | One bull. |
| Remainder of Unit 12 | Sept. 1–Sept. 20 | One bull. |
| **(2)** | | |
| Unit 19(A), excluding the Lime Village Management Area | Sept. 1–Sept. 25<br>Nov. 20–Nov. 30<br>Feb. 1–Feb. 10 | One moose; however, antlerless moose may be taken only from Nov. 20–Nov. 30, and from Feb. 1–Feb. 10. |
| Unit 19(A) within the Lime Village Management Area | Aug. 10–Sept. 25<br>Nov. 20–Dec. 31<br>Feb. 1–Mar. 31 | One moose; only bull moose taken during Sept. 1–Sept. 25 may be transported out of this area; no cow moose may be transported out of this area. |
| Unit 19(B) | Sept. 1–Sept. 30 | One bull. |
| Unit 19(C) | Sept. 1–Oct. 10 | One bull. |
| Unit 19(D), that portion of the Upper Kuskokwim Controlled Use Area within the North Fork drainage from the South Fork upstream to the mouth of the Swift Fork | Sept. 1–Sept. 30 | One bull. |
| Unit 19(D), the remainder of the Upper Kuskokwim Controlled Use Area | Sept. 1–Sept. 30<br>Dec. 1–Feb. 28 | One bull. |
| Remainder of Unit 19(D) | Sept. 1–Sept. 30<br>Dec. 1–Dec. 15 | One bull. |

FISH AND GAME
5 AAC 88.025
5 AAC 88.045
Register 100, January 1985

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Units 25(A), 25(B), and the remainder of Unit 25(D) | July 1–Apr. 30 | 10 caribou; however, no more than 5 caribou may be transported from these units per regulatory year. |

■■■■■■■■

■■■■■■

(Eff. 7/5/85, Reg. 95; am 6/19/86, Reg. 98; am 7/3/86, Reg. 99)

Authority: AS 16.05.255
AS 16.05.258

**5 AAC 88.040. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR GOAT.** There is no open season for goat in Units 12, 19, 20, 21, 24, and 25. (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.045. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR MOOSE.** Subsistence hunting seasons and bag limits for moose are as follows:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (1) | | |
| Unit 12 | No open season. | |
| (2) | | |
| Unit 19(A), excluding the Lime Village Management Area | Sept. 1–Sept. 25<br>Nov. 20–Nov. 30<br>Feb. 1–Feb. 10 | One moose; however, antlerless moose may be taken only from Nov. 20–Nov. 30, and from Feb. 1–Feb. 10. |
| Unit 19(A) within the Lime Village Management Area | Aug. 10–Sept. 25<br>Nov. 20–Mar. 31 | Two moose; however, only residents domiciled in the Lime Village Management Area may hunt. Persons taking moose shall obtain a separate harvest ticket and a separate harvest report for each moose taken. The season will close by emergency order when a total of 20 moose have been taken; however, the season on cows will close by emergency order when 10 cows have been taken. |
| Unit 19(B) | Sept. 1–Sept. 30 | One bull. |
| Unit 19(C) | Sept. 1–Oct. 10 | One bull. |
| Unit 19(D), that portion of the Upper Kuskokwim Controlled Use Area within the North Fork drainage from the South Fork upstream to the mouth of the Swift Fork | Sept. 1–Sept. 30 | One bull. |

———

FISH AND GAME

5 AAC 88.025
5 AAC 88.045
Register 103, October 1987

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Units 25(A), 25(B), and the remainder of Unit 25(D) | July 1–Apr. 30 | 10 caribou; however, no more than 5 caribou may be transported from these units per regulatory year. |

(Eff. 7/5/85, Reg. 95; am 6/19/86, Reg. 98; am 7/3/86, Reg. 99; am 8/8/87, Reg. 103)

Authority: AS 16.05.255
AS 16.05.258

**5 AAC 88.040. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR GOAT.** There is no open season for goat in Units 12, 19, 20, 21, 24, and 25. (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.045. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR MOOSE.** Subsistence hunting seasons and bag limits for moose are as follows:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (1) | | |
| Unit 12 east of the Nabesna River and south of the winter trail from Pickerel Lake southeast to the Canadian border | Sept. 1–Sept. 30 | One bull with at least 50–inch antlers. |
| Unit 12, the Little Tok River drainage upstream from and including the first eastern tributary from the headwaters of Tuck Creek | No open season. | |
| Remainder of Unit 12 | Sept. 1–Sept. 20 | One bull. |
| (2) | | |
| Unit 19, for residents of Lime Village only | Aug. 10–Sept. 25 Nov. 20–Mar. 31 | Two moose, only one of which may be a cow. |
| Unit 19(A) | Sept. 1–Sept. 20 | One bull. |
| | Nov. 20–Nov. 30 Feb. 1–Feb. 10 | One moose. |
| Unit 19(B) | Sept. 1–Sept. 30 | One bull. |
| Unit 19(C) | Sept. 1–Oct. 10 | One bull. |
| Unit 19(D), that portion of the Upper Kuskokwim Controlled Use Area within the North Fork drainage, from the South Fork upstream to the mouth of the Swift Fork | Sept. 1–Sept. 30 | One bull. |

---

FISH AND GAME

5 AAC 81.320

Register 90, July 1984

**5 AAC 81.320. BIG GAME HUNTING.** Following are the seasons and bag limits on big game, and the units or portions of units to which they apply: ...

. . . .

| UNITS | OPEN SEASONS | BAG LIMITS |
|---|---|---|
| Units 13 and 14, except 14(C) | Subsistence Permittees: Aug. 20–Sept. 20 Jan. 1–Mar. 31 | One caribou by drawing permit only. Up to 500 drawing permits will be issued at the discretion of the department. Only anterless caribou may be taken during the Jan. 1–Mar. 31 season. See 5 AAC 81.- |

| UNITS | OPEN SEASONS | BAG LIMITS |
|---|---|---|
| | | 055(c)(3) and separate drawing permit hunt supplement. |
| | Subsistence Permittees: Jan. 1–Mar. 31 | One antlerless caribou by registration or drawing permit only. A subsistence permittee who received a drawing permit for the Aug. 20–Sept. 20 season does not need a registration permit, and is eligible to hunt if he did not take a caribou in the earlier season. Any drawing permits not previously taken will be issued by registration in Glennallen and Cantwell, to qualified subsistence users. See 5 AAC 81.055 and separate registration permit hunt supplement. |
| | Other Residents: Aug. 20–Sept. 20 | One caribou by drawing permit only. Up to 1400 permits will be issued at the discretion of the department. See 5 AAC 81.055 and separate drawing permit hunt supplement. |
| | Nonresidents: No open season. | |
| Unit 14(C) | No open season. | |
| Unit 15 | No open season. | |
| Unit 16 | Aug. 10–Oct. 31 | One caribou. |
| Unit 17 | Aug. 10–Mar. 31 | Three caribou; however, not more than one caribou may be taken before Nov. 1. |
| Unit 18, that portion south of the Yukon River | Feb. 1–Feb. 28 | One caribou. |
| Remainder of Unit 18 | Feb. 1–Mar. 31 | One caribou. |
| Unit 19(A), that portion lying north of the Kuskokwim River | Aug. 10–Sept. 30 Nov. 1–Feb. 28 | One caribou. |
| Unit 19(A), that portion lying south of the Kuskokwim River, and Unit 19(B) | Aug. 10–Mar. 31 | Three caribou; however, not more than one caribou may be taken before Nov. 1. |
| Unit 19(C) | Aug. 10–Oct. 31 | One caribou. |
| Unit 19(D), that portion south and east of the Kuskokwim River and North Fork of the Kuskokwim River | Aug. 10–Sept. 30 Nov. 1–Jan. 31 | One caribou. |
| Remainder of Unit 19(D) | Aug. 10–Sept. 30 | One caribou. |
| Unit 20(A), except the Yanert River drainage | Aug. 20–Sept. 20 Feb. 1–Mar. 31 | One caribou by registration permit only. 600 caribou may be taken. The Aug. 20–Sept. 20 season will be closed when 300 caribou have been taken; the Feb. 1–Mar. 31 season will be closed when the total harvest reaches 600 caribou. See 5 AAC 81.055 and separate registration permit hunt supplement. |

| UNITS | OPEN SEASONS | BAG LIMITS |
|---|---|---|
| Unit 20(A), that portion within the Yanert River drainage | Aug. 10–Mar. 31 | One caribou. |
| Units 20(B) and 25(C) | Aug. 10–Sept. 20 | One bull. |
| Unit 20(C) | No open season. | |
| Unit 20(D), that portion lying south of the Alaska Highway | Aug. 10–Sept. 30 | One bull by drawing permit only. 140 permits will be issued. See 5 AAC 81.055 and separate drawing permit hunt supplement. |
| Unit 20(F) | Aug. 10–Sept. 30 | One caribou. |
| Unit 21, except that portion of Unit 21(D) west of the Yukon and Koyukuk Rivers | Aug. 10–Sept. 30 | One caribou. |
| Unit 21(D), that portion west of the Yukon and Koyukuk Rivers, and Units 22(A), 22(B), 23, and 26(A) | July 1–Apr. 30 | Five caribou per day; however, no more than five caribou may be transported south of the Yukon River per regulatory year. |
| Units 22(C), 22(D), and 22(E) | No open season. | |

---

FISH AND GAME

5 AAC 81.320
Register 94, July 1985

**5 AAC 81.320. BIG GAME HUNTING.** Following are the seasons and bag limits for big game, and the units or portions of units in which they apply: ...

....

| UNITS | OPEN SEASON | BAG LIMITS |
|---|---|---|
| Unit 19(A), the Lime Village Management Area only (5 AAC 81.238(10)) | Aug. 10–Mar. 31 | Five caribou; however, no person may transport more than one caribou out of this area, and then only if it is taken during the Sept. 1–Oct. 15 season. |
| Unit 19(A), that portion lying south of the Kuskokwim River, excluding the Lime Village Management Area, and Unit 19(B) | Aug. 10–Mar. 31 | Three caribou; however, not more than one caribou may be taken before Nov. 1 |
| Unit 19(C) | Aug. 10–Oct. 31 | One caribou. |
| Unit 19(D), that portion south and east of the Kuskokwim River and the North Fork of the Kuskokwim River | Aug. 10–Sept. 30 | One caribou. |
| Remainder of Unit 19(D) | Aug. 10–Sept. 30 | One caribou. |
| Unit 20(A), that portion north of the Yanert Controlled Use Area, west of the Wood River Controlled Use Area, and south of the Rex Trail | Aug. 10–Dec. 31 | One caribou by drawing permit only. 200 permits will be issued. See 5 AAC 81.055 and separate registration permit hunt supplement. |
| Unit 20(A), the Yanert Controlled Use Area only | Sept. 1–Feb. 28 | One caribou. |
| Remainder of Unit 20(A) | Sept. 1–Sept. 15 | One caribou. |
| Units 20(B) and 25(C) | Aug. 10–Sept. 20 | One bull. |

| UNITS | OPEN SEASON | BAG LIMITS |
|---|---|---|
| Unit 20(C) | No open season. | |
| Unit 20(D), that portion lying south of the Alaska Highway only | Aug. 10–Sept. 30 | One bull by drawing permit only. 140 permits will be issued. See 5 AAC 81.055 and separate drawing permit hunt supplement. |
| Unit 20(F), Tozitna River drainage | Aug. 10–Sept. 30<br>Mar. 1–Mar. 15 | One caribou; however, only bull caribou may be taken during the Aug. 10–Sept. 30 season. |
| Remainder of Unit 20(F) | Aug. 10–Sept. 30 | One bull. |
| Unit 21, except that portion of Unit 21(D) west of the Yukon and Koyukuk Rivers | Aug. 10–Sept. 30 | One caribou. |

---

FISH AND GAME
EMERGENCY REGULATIONS

5 AAC 88.020
5 AAC 88.025

Register 95, October 1985

| UNITS | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Unit 25(C) | Sept. 1–Nov. 30<br>Apr. 1–May 31 | One bear every four regulatory years. |

(Expires November 1, 1985 unless made "permanent" by the adopting agency) (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.025. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR CARIBOU.** Subsistence hunting seasons and bag limits for caribou are

| UNITS | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (1) | | |
| Units 12 and 20(D) north of the Alaska Highway, and Unit 20(E) | Aug. 10–Sept. 20<br>Nov. 20–Feb. 28 | Two bulls; however, only one bull may be taken from Aug. 10–Sept. 20, and only antlerless bulls may be taken from Dec. 10–Feb. 28. |
| Remainder of Unit 12 | Sept. 1–Sept. 20 | One bull. |
| (2) | | |
| Unit 19(A) north of the Kuskokwim River | Aug. 10–Sept. 30<br>Nov. 1–Feb. 28 | One caribou. |
| Unit 19(A) south of the Kuskokwim River excluding the Lime Village Management Area, and Unit 19(B) | Aug. 10–Mar. 31 | Three caribou; not more than one may be taken before Nov. 1. |
| Unit 19(A) within the Lime Village Management Area | Aug. 10–Mar. 31 | Five caribou; only caribou taken from Sept. 1–Oct. 15 may be transported out of this area; not more than one caribou may be transported out of this area. |
| Unit 19(C) | Aug. 10–Oct. 31 | One caribou. |

| UNITS | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Unit 19(D) south and east of the Kuskokwim River and North Fork of the Kuskokwim River | Aug. 10–Sept. 30 Nov. 1–Jan. 31 | One caribou. |
| Remainder of Unit 19(D) | Aug. 10–Sept. 30 | One caribou. |
| (3) | | |
| Unit 20(A) north of the Yanert Controlled Use Area, west of the Wood River Controlled Use Area, and south of the Rex Trail | Aug. 10–Dec. 31 | One caribou by tier II hunting permit only. 200 permits will be issued. |
| Unit 20(A) within the Yanert Controlled Use Area | Sept. 1–Feb. 28 | One caribou. |

FISH AND GAME

5 AAC 88.020
5 AAC 88.025

Register 96, January 1986

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Unit 25(C) | Sept. 1–Nov. 30 Apr. 1–May 31 | One bear every four regulatory years. |

(Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.025. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR CARIBOU.** Subsistence hunting seasons and bag limits for caribou are as follows:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (1) | | |
| Units 12 and 20(D) north of the Alaska Highway, and Unit 20(E) | Aug. 10–Sept. 20 Nov. 20–Feb. 28 | Two bulls; however, only one bull may be taken from Aug. 10–Sept. 20, and only antlerless bulls may be taken from Dec. 10–Feb. 28. |
| Remainder of Unit 12 | Sept. 1–Sept. 20 | One bull. |
| (2) | | |
| Unit 19(A) north of the Kuskokwim River | Aug. 10–Sept. 30 Nov. 1–Feb. 28 | One caribou. |
| Unit 19(A) south of the Kuskokwim River excluding the Lime Village Management Area, and Unit 19(B) | Aug. 10–Mar. 31 | Three caribou; however, not more than one may be taken before Nov. 1. |
| Unit 19(A) within the Lime Village Management Area | Aug. 10–Mar. 31 | Five caribou; however, only one caribou may be transported out of this area and only if taken between Sept. 1–Oct. 15. |
| Unit 19(C) | Aug. 10–Oct. 31 | One caribou. |
| Unit 19(D) south and east of the Kuskokwim River and North Fork of the Kuskokwim River | Aug. 10–Sept. 30 Nov. 1–Jan. 31 | One caribou. |

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Remainder of Unit 19(D) <br> (3) | Aug. 10–Sept. 30 | One caribou. |
| Unit 20(A) north of the Yanert Controlled Use Area, west of the Wood River Controlled Use Area, and south of the Rex Trail | Aug. 10–Dec. 31 | One caribou by tier II hunting-permit only. 200 permits will be issued. |
| Unit 20(A) within the Yanert Controlled Use Area | Sept. 1–Feb. 28 | One caribou. |

FISH AND GAME

5 AAC 88.020
5 AAC 88.025
Register 98, July 1986

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| Unit 25(C) | Sept. 1–Nov. 30 <br> Apr. 1–May 31 | One bear every four regulatory years. |

(Eff. 7/5/85, Reg. 95; am 6/19/86, Reg. 98)

Authority: AS 16.05.255

**5 AAC 88.025. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR CARIBOU.** Subsistence hunting seasons and bag limits for caribou are as follows:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (1) | | |
| Units 12 and 20(D) north of the Alaska Highway, and Unit 20(E) | Aug. 10–Sept. 20 <br> Nov. 20–Feb. 28 | Two bulls; however, only one bull may be taken from Aug. 10–Sept. 20, and only antlerless bulls may be taken from Dec. 10–Feb. 28. |
| Remainder of Unit 12 <br> (2) | Sept. 1–Sept. 20 | One bull. |
| Unit 19(A) north of the Kuskokwim River | Aug. 10–Sept. 30 <br> Nov. 1–Feb. 28 | One caribou. |
| Unit 19(A) south of the Kuskokwim River excluding the Lime Village Management Area, and Unit 19(B) | Aug. 10–Mar. 31 | Three caribou; however, not more than one may be taken before Nov. 1. |
| Unit 19(A) within the Lime Village Management Area | Aug. 10–Mar. 31 | Five caribou; however, only one caribou may be transported out of this area and only if taken between Sept. 1–Oct. 15. |
| Unit 19(C) | Aug. 10–Oct. 31 | One caribou. |
| Unit 19(D) south and east of the Kuskokwim River and North Fork of the Kuskokwim River | Aug. 10–Sept. 30 <br> Nov. 1–Jan. 31 | One caribou. |
| Remainder of Unit 19(D) <br> (3) | Aug. 10–Sept. 30 | One caribou. |
| Unit 20(A) north of the Yanert Controlled Use Area, west of | Aug. 10–Dec. 31 | One caribou by tier II hunting permit only. 200 permits will |

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| the Wood River Controlled Use Area, and south of the Rex Trail | | be issued. |
| Unit 20(A) within the Yanert Controlled Use Area | Sept. 1–Feb. 28 | One caribou. |

---

FISH AND GAME

5 AAC 88.020
5 AAC 88.025
Register 103, October 1987

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (5) | | |
| Unit 24, that portion of the Koyukuk River drainage upstream from, and including, the Alatna River drainage | Residents of Anaktuvuk Pass: Sept. 1–Oct. 31 April 1–May 31 | One bear. |
| | Other subsistence hunters: Sept. 1–Oct. 31 May 10–May 31 | One bear every four regulatory years. |
| Remainder of Unit 24 | Sept. 1–Dec. 31 May 10–May 25 | One bear every four regulatory years. |
| Unit 25 | No open season. | |

(Eff. 7/5/85, Reg. 95; am 6/19/86, Reg. 98; am 8/8/87, Reg. 103)

Authority: AS 16.05.255
AS 16.05.258

**5 AAC 88.025. SUBSISTENCE HUNTING SEASONS AND BAG LIMITS FOR CARIBOU.** Subsistence hunting seasons and bag limits for caribou are as follows:

| UNIT | OPEN SEASON | BAG LIMIT |
|---|---|---|
| (1) | | |
| Units 12 and 20(D) north of the Alaska Highway, and Unit 20(E) | Aug. 10–Sept. 30 | One bull. |
| | Dec. 1–Feb. 28 | One antlerless bull. |
| Remainder of Unit 12 | Sept. 1–Sept. 20 | One bull. |
| Unit 20(D) south of the Alaska Highway | Aug. 10–Sept. 30 | One bull. |
| (2) | | |
| Unit 19(A) north of the Kuskokwim River | Aug. 10–Sept. 30 Nov. 1–Feb. 28 | One caribou. |
| Unit 19(A) south of the Kuskokwim River and Unit 19(B) | Residents of Lime Village: Aug. 10–Mar. 31 | Five caribou. |
| | Other Subsistence Hunters: Aug. 10–Oct. 31 | One caribou. |
| | Nov. 1–Mar. 31 | Three caribou. |
| Unit 19(C) | Aug. 10–Oct. 10 | One caribou. |

FISH AND GAME
EMERGENCY REGULATIONS

5 AAC 88.400
5 AAC 88.500
Register 95, October 1985

(A) those portions of Units 21 and 24 bounded by a line from the north bank of the Yukon River at Koyukuk, then northerly to the confluence of the Honhosa and Kateel Rivers, then northeasterly to the confluence of Billy Hawk Creek and the Huslia River (65° 57′ N. lat., 156° 41′ W. long.), then easterly to the south end of Solsmunket Lake, then east to Hughes, then south to Little Indian River, then southwesterly to the crest of Hochandochtla Mountain, then westerly to the north end of Coffee Can Lake, then southerly to Bishop Rock (Yistletaw), then westerly along the north bank of the Yukon River including Koyukuk Island to the point of beginning;

(B) the Koyukuk Controlled Use Area is closed during moose hunting seasons to the use of aircraft in any manner for hunting moose, including transportation of moose hunters of moose parts; however, this does not apply to transportation of moose hunters or moose parts by regularly scheduled flights to and between villages by carriers that normally provide scheduled service to this area;

(7) the Kanuti Controlled Use Area

(A) that portion of Unit 24 bounded by a line from the Bettles Field VOR to the east side of Fish Creek Lake, to Old Dummy Lake, to the south end of Lake Todatonten (including all waters of these lakes), to the northernmost headwaters of Siruk Creek, to the highest peak of Double Point Mountain, then back to the Bettles Field VOR;

(B) the Kanuti Controlled Use Area is closed during moose hunting seasons to the use of aircraft in any manner for hunting moose, including transportation of moose hunters or moose parts; however, this does not apply to transportation of moose hunters or moose parts by regularly scheduled flights to and between villages by carriers that normally provide scheduled service to this area;

(8) the Upper Kuskokwim Controlled Use Area

(A) that portion of Unit 19(D) upstream from the mouth of Big River including the drainages of the Big River, Middle Fork, South Fork, East Fork, and Tonzona River, and bounded by a line following the west bank of the Swift Fork (McKinley Fork) Kuskokwim River from the Kuskokwim River to 152° 50′ W. long., then north to the boundary of Denali National Preserve, then following the western boundary of Denali National Preserve north to its intersection with the Minchumina–Telida winter trail, then west to the crest of Telida Mountain, then north along the crest of Munsatli Ridge to elevation 1610, then northwest to Dyckman Mountain and following the crest of the divide between the Kuskokwim River and the Nowitna drainage, and the divide between the Kuskokwim River and the Nixon Fork River to Loaf bench mark on Halfway Mountain, then south to the west side of Big River drainage at the point of beginning;

(B) the Upper Kuskokwim Controlled Use Area is closed during moose hunting seasons to the use of aircraft in any manner for hunting moose, including transportation of moose hunters or moose parts; however, this does not apply to transportation of moose hunters or moose parts by regularly scheduled flights to and between villages by carriers that normally provide scheduled service to this area;

(9) the Yanert Controlled Use Area, which consists of that portion of Unit 20(A) drained by the Nenana River upstream from and including the Yanert Fork drainage, is closed to the use of motorized vehicles, except aircraft, in any manner for big game hunting and transportation of big game parts; however, this does not prohibit motorized access and transportation of game on the Parks Highway. (**Expires November 1, 1985 unless made "permanent" by the adopting agency**) (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.500. MANAGEMENT AREAS.** The following management areas are subject to special restrictions for hunting

(1) the Minto Flats Management Area

(A) that portion of Unit 20 bounded by the Elliot Highway beginning at Mile 118, then northeasterly to Mile 96, then east to the Tolovana Hotsprings Dome, then east to the Winter Cat Trail, then along the Cat Trail south to the Old Telegraph Trail at Dunbar, then westerly along the trail to a point where it joins the Tanana River three miles above Old Minto, then along the north bank of the Tanana River (including all channels and sloughs except Swan Neck Slough), to the confluence of the Tanana and Tolovana Rivers and then northerly to the point of beginning;

(B) the Minto Flats Management Area is open to moose hunting by permit only;

(2) the Tok Management Area

(A) those portions of Units 12, 13(C), and 20(D) bounded by a line along the Alaska Highway east from the east side of the Johnson River bridge to Tok Junction, then south along the Tok–Slana cutoff (Glenn Highway) to the Slana River, then west along the north bank of the Slana River to its confluence with Lost Creek, then up the north side of Lost Creek to the divide between Lost Creek and Jack Creek, then north to the Unit 12 boundary, then west along the Unit 12 boundary to Mount Kimball (63° 17′ N. lat., 145° 40′ W. long.), then west in a straight line to Mount Gakona (63° 17′ N. lat., 145° 12′ W. long.), then northerly along the east bank of the Johnson Glacier and Johnson River to the Johnson River bridge;

(B) the Tok Management Area is open to Dall sheep hunting by permit only;

(3) the Dalton Highway Corridor Management Area, consisting of those portions of Game Management Units 20, 24, 25, and 26 extending five miles from each side of the Dalton Highway from the Yukon River to the Prudhoe Bay Closed Area, is closed to hunting, except big game and small game may be taken in the area by bow and arrow;

(4) the Fairbanks Management Area

(A) that portion of Unit 20(B) bounded by a line from the confluence of Rosie Creek and the Tanana River, northerly along Rosie Creek to the divide between Rosie Creek and Cripple Creek, then down Cripple Creek to its confluence with Ester Creek, then up Ester Creek to its confluence with Ready Bullion Creek, then up Ready Bullion Creek to the summit of Ester Dome, then down Sheep Creek to its confluence with Goldstream Creek, then easterly along Goldstream Creek to its confluence with First Chance Creek, then up First Chance Creek to Tungsten Hill, then southerly along Steele Creek to its intersection with the Trans–Alaska Pipeline, then southerly along the pipeline right-of-way to the Chena River, then along the north bank of the Chena River to the Moose Creek dike, then southerly along Moose Creek dike to its intersection with the Tanana River, and then westerly along the north bank of the Tanana River to the point of beginning;

(B) The Fairbanks Management Area is open to moose hunting by bow and arrow only;

(5) the Delta Junction Management Area described as follows, is closed to the taking of moose:

that portion of Unit 20(D) bounded by a line beginning at the confluence of Donnelly Creek with the Delta River, then up Donnelly Creek to the Richardson Highway (Mile 238), then north along the east side of the highway to the coal mine road (Mile 242), then east along the south side of the coal mine road to the junction with the trail to Jarvis Creek, then down the east bank of Jarvis Creek to the 33–Mile Loop Road crossing (Mile 12), then northeast along the 33–Mile Loop Road to the intersection with the Alaska Highway (Mile 1414), then southeast along the north side of the Alaska Highway to the bridge at Sawmill Creek (Mile 1403.9), then down the west bank of Sawmill Creek to its confluence with Clearwater Creek and down the south bank of Clearwater Creek to its confluence with the Tanana River, then down the Tanana River to its confluence with the Delta River, and upstream along the east bank of the Delta River to the point of beginning at Donnelly Creek.

(6) the Lime Village Management Area

(A) that portion of Unit 19(A) drained by the Stony River from the mouth of the Stink River, including the Stink River drainage, upstream to but not including the Can Creek drainage;

(B) only bull moose taken from September 1 through September 25 and caribou taken from September 1 through October 15 may be transported out of the area; no cow moose and only one caribou may be transported out of the area. **(Expires November 1, 1985 unless made "permanent" by the adopting agency)** (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 88.600. CLOSURES AND RESTRICTIONS ON STATE GAME REFUGES.** In the Creamer's Field Migratory Waterfowl Refuge near Fairbanks in Unit 20, moose may be taken only by bow and arrow. That portion of the refuge within the Fairbanks city limits is closed by city ordinance to the discharge of firearms. **(Expires November 1, 1985 unless made "permanent" by the adopting agency)** (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

### ARTICLE 9.
### GENERAL

**5 AAC 88.910. ELIGIBILITY FOR HUNTING IN GATES OF THE ARCTIC NATIONAL PARK.** For federal regulations and information concerning who is qualified to hunt in the Gates of the Arctic National Park, see 36 CFR Part 13, or contact the Superintendent, Gates of the Arctic National Park, P.O. Box 74680, Fairbanks, Alaska 99707, phone 456-0281. **(Expires November 1, 1985 unless made "permanent" by the adopting agency)** (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

### CHAPTER 90.
### GENERAL PROVISIONS

Repealed 7/5/85.

### CHAPTER 92.
### STATEWIDE PROVISIONS

### ARTICLE 1.
### GENERAL

**5 AAC 92.001. APPLICATION OF THIS CHAPTER.** Except as specifically provided otherwise, the regulations in this chapter apply statewide, to subsistence hunting, general hunting, and trapping, as applicable. **(Expires November 1, 1985 unless made "permanent" by the adopting agency)** (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 92.002. LIABILITY FOR VIOLATIONS.** Unless otherwise provided in 5 AAC 78—5 AAC 92, or in AS 16, a person who violates a provision of 5 AAC 78—5 AAC 92 is strictly liable for the offense, regardless of that person's intent. **(Expires November 1, 1985 unless made "permanent" by the adopting agency)** (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

**5 AAC 92.005. POLICY FOR CHANGING BOARD AGENDA.** The Board of Game may change its schedule for consideration of proposed regulatory changes in accordance with the following guidelines:

(1) a request for a change must state in writing the change proposed and the reason it should be considered out of sequence;

(2) a request must be sent to the Executive Director of the Boards of Fisheries and Game before July 15, unless the board allows an exception to the deadline because of an emergency;

(3) the executive director shall attempt to obtain comments on the request from as many board members as can be contacted; and

(4) if a majority of the board members contacted approve the request, the executive director shall notify the public and the department of the agenda change. (**Expires November 1, 1985 unless made "permanent" by the adopting agency**) (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

---

FISH AND GAME

5 AAC 88.500

Register 103, October 1987

**5 AAC 88.500. MANAGEMENT AREAS.** The following management areas are subject to special restrictions for hunting:

(1) the Minto Flats Management Area:

(A) the area consists of that portion of Unit 20 bounded by the Elliot Highway beginning at Mile 118, then northeasterly to Mile 96, then east to the Tolovana Hotsprings Dome, then east to the Winter Cat Trail, then along the Cat Trail south to the Old Telegraph Trail at Dunbar, then westerly along the trail to a point where it joins the Tanana River three miles above Old Minto, then along the north bank of the Tanana River (including all channels and sloughs except Swan Neck Slough), to the confluence of the Tanana and Tolovana Rivers and then northerly to the point of beginning;

(B) the area is open to moose hunting by permit only;

(2) the Tok Management Area:

(A) the area consists of those portions of Units 12, 13(C), and 20(D) bounded by a line along the Alaska Highway east from the east side of the Johnson River bridge to Tok Junction, then south along the Tok–Slana cutoff (Glenn Highway) to the Slana River, then west along the north bank of the Slana River to its confluence with Lost Creek, then up the north side of Lost Creek to the divide between Lost Creek and Jack Creek, then north to the Unit 12 boundary, then west along the Unit 12 boundary to Mount Kimball (63° 17′ N. lat., 144° 40′ W. long.), then west in a straight line to Mount Gakona (63° 17′ N. lat., 145° 12′ W. long.), then northerly along the east bank of the Johnson Glacier and Johnson River to the Johnson River bridge;

(B) the area is open to sheep hunting by permit only;

(3) the Dalton Highway Corridor Management Area, which consists of those portions of Units 20, 24, 25, and 26 extending five miles from each side of the Dalton Highway from the Yukon River to the Prudhoe Bay closed area, is closed to hunting; however, big game and small game may be taken in the area by bow and arrow only, except that moose may not be taken within two miles of the highway in Unit 26(B); no motorized vehicle, except boats, aircraft and licensed highway vehicles, may be used to transport game or hunters within the Dalton Highway Corridor Management Area;

(4) the Fairbanks Management Area, described as follows, is open to moose hunting by bow and arrow only:

the Goldstream subdivision (SE¼ SE¼ Section 28 and Section 33, Township 2 North, Range 1 West, and Fairbanks Meridian) and that portion of Unit 20(B) bounded by a line from the confluence of Rosie Creek and the Tanana River, northerly along Rosie Creek to the divide between Rosie Creek and Cripple Creek, then down Cripple Creek to its confluence with Ester Creek, then up Ester Creek to its confluence with Ready Bullion Creek, then up Ready Bullion Creek to the summit of Ester Dome, then down Sheep Creek to its confluence with Goldstream Creek, then easterly along Goldstream Creek to its confluence with First Chance Creek, then up First Chance Creek to Tungsten Hill, then southerly along Steele Creek to its intersection with the Trans–Alaska Pipeline, then southerly along the pipeline right-of-way to the Chena River, then along the north bank of the Chena River to the Moose Creek dike, then southerly along Moose Creek dike to its intersection with the Tanana River, and then westerly along the north bank of the Tanana River to the point of beginning;

(5) the Delta Junction Management Area described as follows, is closed to the taking of moose:

that portion of Unit 20(D) bounded by a line beginning at the confluence of Donnelly Creek and the Delta River, then up Donnelly Creek to the Richardson Highway (Mile 238), then north along the east side of the highway to the coal mine road (Mile 242), then east along the south side of the coal mine road to the junction with the trail to Jarvis Creek, then down the east bank of Jarvis Creek to the 33–Mile Loop Road crossing (Mile 12), then northeast along the 33–Mile Loop Road to the intersection with the Alaska Highway (Mile 1414), then southeast along the north side of the Alaska Highway to the bridge at Sawmill Creek (Mile 1403.9), then down the west bank of Sawmill Creek to its confluence with Clearwater Creek and down the south bank of Clearwater Creek to its confluence with the Tanana River, then down the Tanana River to its confluence with the Delta River, and upstream along the east bank of the Delta River to the point of beginning at Donnelly Creek.

(6) repealed 8/8/87.

(Eff. 7/5/85, Reg. 95; am 7/3/86, Reg. 99; am 8/8/87, Reg. 103)

Authority: AS 16.05.255
AS 16.05.789

**5 AAC 88.600. CLOSURES AND RESTRICTIONS IN STATE GAME REFUGES.** In the Creamer's Field Migratory Waterfowl Refuge near Fairbanks in Unit 20, moose may be taken only by bow and arrow. That portion of the refuge within the Fairbanks city limits is closed by city ordinance to the discharge of firearms. (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255
AS 16.05.789
AS 16.20.039
AS 16.20.040

## ARTICLE 9.
## GENERAL

**Section**

**910. Eligibility for hunting in Gates of the Arctic National Park**

**5 AAC 88.910. ELIGIBILITY FOR HUNTING IN GATES OF THE ARCTIC NATIONAL PARK.** For federal regulations and information concerning who is qualified to hunt in the Gates of the Arctic National Park, see 36 CFR Part 13, or contact the Superintendent, Gates of the Arctic National Park, P.O. Box 74680, Fairbanks, Alaska 99707, phone 456–0281. (Eff. 7/5/85, Reg. 95)

Authority: AS 16.05.255

## CHAPTER 90.
## GENERAL PROVISIONS

Repealed 7/5/85.
APPENDIX II

United States Department of the Interior
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240
May 14, 1982

Honorable Jay S. Hammond
Governor of Alaska
Juneau, Alaska 99811

Dear Jay:

Thank you for your letter of April 29, 1982, by which you transmitted the final elements of the State's subsistence management and use program for review under subsection 805(d) of the Alaska National Interest Lands Conservation Act (ANILCA). Based upon

our review of that submission, material transmitted to us by the State on December 2 and 23, 1981, and other relevant information, we have determined that the State's program will be in compliance with sections 803, 804 and 805 of ANILCA as of June 2, 1982. As a result of this certification of compliance, the State retains its traditional role in the regulation of fish and wildlife resources on the public lands in Alaska.

The State is to be commended for its determined effort to establish a workable subsistence program which accommodates the needs and concerns of Alaska residents and satisfies the requirements of ANILCA. The subsistence issue is complex and sensitive, and we appreciate the measures the State has taken to achieve compliance with Title VIII of ANILCA. We are confident that Alaska's subsistence authority, enacted as law and implemented through the State program, will be exercised in the best interests of rural residents engaged in subsistence uses and in furtherance of the overall resource management objectives of the State.

In accordance with subsection 805(a) of ANILCA, a reimbursement payment will be forwarded to the State for costs incurred in the establishment of a regional council system which complies with subsection 805(d). Subject to the execution of an agreement between the Department and the State, additional appropriated funds will be made available to the State for costs to be incurred in the operation of the regional councils and local advisory committees. If you require further assistance, please contact Deputy Under Secretary William P. Horn at (202) 343–5183. Please convey our commendation to all State officials who have participated in this undertaking.

Sincerely,
(s) Jim Watt
Secretary

---

United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240
September 23, 1985

Honorable Bill Sheffield
Governor of Alaska
Juneau, Alaska 99811

Dear Governor Sheffield:

On May 14, 1982, former Secretary of the Interior James Watt certified that the State of Alaska's subsistence program complied with the requirements of sections 803, 804 and 805 of the Alaska National Interest Lands Conservation Act (ANILCA), 15 U.S.C. §§ 3113, 3114 and 3115. Accordingly, the State has for the last three years assumed primary responsibility for the management of the program providing the preference for subsistence uses on the public lands in Alaska. Unfortunately, the Department of the Interior finds it necessary to advise you formally that the State subsistence program is no longer in compliance with the requirements of ANILCA as specified in Title VIII.

As you are aware, the Alaska Supreme Court, in Madison v. Alaska Department of Fish and Game, 696 P.2d 168, Op. No. 2911 (Alaska Feb. 22, 1985), invalidated a State Board of Fisheries regulation designed to determine eligibility for subsistence fishing in the Cook Inlet Region because the regulation was inconsistent with the State subsistence statute. This ruling held that under the State statute the subsistence preference must be extended to both "rural" and "urban" subsistence users. Because section 803 of ANILCA limits the subsistence preference to "rural Alaska residents," the Madison decision raised questions as to the continuing eligibility of the State to manage subsistence on public lands in Alaska under section 805(d) of ANILCA. In an effort to determine the State's views on this issue prior to Departmental action, I requested on April 7, 1985, the legal opinion of the State Attorney General on the effect of the Madison decision. To date we have received no formal response from the State on the effect of Madison on the State's eligibility under section 805(d) of ANILCA. We did receive a letter outlining the administrative actions taken by the State in the wake of Madison but it offered no opinion

regarding compliance with Title VIII. Nonetheless, the absence of legislative action this year to amend the State subsistence statute to conform to ANILCA has confirmed our preliminary determination that the State is no longer in compliance with the requirements of section 805(d).

You are hereby advised that the State has until June 1, 1986, to revise its subsistence program to bring it back into compliance with the requirements of sections 803, 804 and 805 of ANILCA. Compliance will require that the subsistence preference be limited to those rural Alaska residents who customarily and traditionally make use of subsistence resources. If the State has not conformed its subsistence program to the requirements of ANILCA by that date, the Department will be obligated to discharge its obligations pursuant to section 805. As we noted to the State Boards of Fisheries and Game in 1982, there are various ways to comply with the requirements of section 805; the regime in force when the Madison decision was handed down represented one possible approach. I am confident and hopeful that the State can make the necessary changes in its program within this period, and I offer the full cooperation and assistance of the Department in this effort.

The Department has concluded that section 805(d) does not require an immediate Federal take over of the subsistence program, given the circumstances by which non-compliance with the ANILCA requirements has occurred. Section 805(d) provided the State with a one year period of grace following enactment of ANILCA in order to give the State an adequate amount of time to prepare and implement a program that met the requirements of ANILCA. After successfully establishing an adequate program, the State made a good faith effort to keep in compliance with the requirements of Title VIII of ANILCA. Indeed, the recent problems that have befallen the State's program have not been the result of legislative repeal of the program; instead, an unexpected State Supreme Court ruling in a case that was vigorously defended by the State has altered the State's subsistence program and created a non-compliance situation. Under these circumstances, we are persuaded that the spirit and intent of section 805(d) warrants a grace period in order to provide the State with a reasonable opportunity to make the necessary adjustments to its program. We have chosen as a deadline June 1, 1986, because it is roughly one year from the time the State legislature failed to rectify the State subsistence statute.

This course of action is further justified due to the fact that it appears unlikely that any adverse impact on rural subsistence uses will occur during the grace period. The State subsistence program will continue to ensure that the Title VIII class of rural subsistence users are able to hunt, trap, and fish for necessary resources. The problem is that the Madison decision permits urban residents to be included in the subsistence class, contrary to the requirement of ANILCA that the preference be limited to rural residents. My decision that a grace period is warranted would, of course, have to change if significant adverse impacts on rural, customary and traditional subsistence users and on subsistence resources subsequently become apparent.

I fully expect that the State, in cooperation with the Department, will bring its subsistence program back into compliance with the requirements of Title VIII of ANILCA prior to June 1, 1986. I have, however, directed the U.S. Fish and Wildlife Service, in cooperation with the Office of the Solicitor, to begin preparation of a contingency plan for providing the subsistence preference on public lands that meets the requirements of ANILCA. My goal is to ensure that, in the event that the State is not able to bring its program into compliance by June 1, 1986, the Department is ready and able to discharge effectively its obligations under sections 803, 804 and 805 of ANILCA.

As a matter of information, the Madison ruling does not expand eligibility to pursue subsistence activities in those national parks and monuments where subsistence taking is authorized. Eligibility to engage in subsistence activities within those units of the National Parks System in Alaska is still determined pursuant to Federal regulations issued in 1981, since the State of Alaska never sought to acquire control of this aspect of the ANILCA subsistence program.

I regret the unexpected decision by the Alaska Supreme Court in the <u>Madison</u> case that has moved the State subsistence program out of compliance with the requirements of ANILCA. I am confident, though, that the State will be able to bring its program back into compliance by within one year.

Sincerely,
(s) Bill Horn
William P. Horn
Assistant Secretary
Fish and Wildlife and Parks

cc: AK Delegation
CHM–Sen Energy
CHM–House Interior
Ranking Minority of both Committees
Asst. Sec., Peter Myers, U.S. Dept. Agriculture